# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

LEGATUS, et al.,

     Plaintiffs,

v.                          Case No. 12-12061

KATHLEEN SEBELIUS, et al.,

     Defendants.

_____/

## ORDER GRANTING PLAINTIFFS DANIEL WEINGARTZ'S AND WEINGARTZ SUPPLY COMPANY'S MOTION FOR PRELIMINARY INJUNCTION AND DENYING WITHOUT PREJUDICE PLAINTIFF LEGATUS'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Legatus, Daniel Weingartz, and Weingartz Supply Company, all adherents to the tenets of Roman Catholicism, move for a preliminary injunction under the Religious Freedom Restoration Act. They each seek to enjoin the Government from enforcing the provision of the Patient Protection and Affordable Care Act that requires all group health plans, other than those that are "grandfathered" and exempt, to provide the full range of FDA-approved contraceptive methods without cost sharing.

The motion has been fully briefed, and a hearing was held on September 28, 2012. For the following reasons, the preliminary injunction is granted as to Daniel Weingartz and Weingartz Supply Company and denied without prejudice as to Legatus.

## I. BACKGROUND

The Patient Protection and Affordable Care Act ("ACA") requires all group health plans and health insurance issuers that offer non-grandfathered group or individual

health coverage to provide coverage to women without cost sharing that includes "preventive care and screenings . . . as provided for in the comprehensive guidelines supported by the Health Resources and Services Administration ['HRSA']."  42 U.S.C. § 300gg-13(a)(4).  "Without cost sharing" in this context means free of cost to the patient.

The Government issued interim final regulations implementing this preventive services coverage provision on July 19, 2010, requiring a group health plan or health insurance issuer offering non-grandfathered health coverage to provide, without cost sharing, the recommended preventive services for plan years beginning on or after one year from the date the recommendation is issued ("HRSA Mandate").  75. Fed. Reg. 41,728–41,729.

The HRSA enlisted the Institute of Medicine ("IOM"), an independent, non-profit organization established under the National Academy of Sciences, to develop recommendations for the HRSA guidelines.  *See* Institute of Medicine, Clinical Services for Women: Closing the Gaps 2 (2011) ("IOM Rep.").  The IOM issued a report that recommended the HRSA guidelines include, among other things, "the full range of Food and Drug Administration ['FDA']-approved contraceptive methods, sterilization procedures, and patient and education counseling for women with reproductive capacity."  *Id.* at 10.  FDA-approved contraceptive methods, in turn, are found to include oral contraceptives, "emergency contraceptive" abortifacients (such as "Plan B" and "Ella"), and intrauterine devices.  FDA, Birth Control Guide 10–12, 16–20 (2012), *available at* http:// www.fda.gov/ ForConsumers/ ByAudience/ ForWomen/ ucm118465. On August 1, 2011, the HRSA adopted the IOM's recommendations in full.  *See* HRSA,

2

Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/ womensguidelines/ (last visited Oct. 10, 2012).  On that same date, Health and Human Services, the Department of Health, and the Department of Labor issued an amendment to the interim final rule that allowed the HRSA to exempt "religious employers" from covering contraceptive services.  76 Fed. Reg. 46,623.  A religious employer was defined as one that:

> (1) [h]as the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code.

Id.  The HRSA so exempted organizations that qualified as a religious employer.  77 Fed. Reg. 8,727.  Consequently, the HRSA Mandate for non-exempted and non-grandfathered plans would take effect for plan years beginning on or after August 1, 2012.  See 76 Fed. Reg. 46,621.

After allowing for public comment, the Government in February 2012 adopted in final regulations the definition of "religious employer" as described in the amended interim final regulations.  77 Fed. Reg. 8,727.  At that same time, a temporary enforcement safe harbor was created to develop and propose changes to the final regulations for the purpose of satisfying two goals: "providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services."  Id.  The temporary safe harbor is in effect until the first plan year that begins on or after August 1, 2013.  Department of Health and Human Services, Guidance on the Temporary

3

Enforcement Safe Harbor 3 (Aug. 15, 2012), *available at* http:// cciio.cms.gov/

resources/ files/ prev-services-guidance-08152012.pdf.  The Government explained:

> Neither employers, nor group health plans, nor group health insurance issuers will be subject to any enforcement action by the Departments for failing to cover some or all of the recommended contraceptive services without cost sharing in non-exempted, non-grandfathered group health plans established or maintained by an organization . . . meeting all of the following criteria:
>
> (1) The organization is organized and operates as a non-profit entity.
> (2) From February 10, 2012 onward, the group health plan established or maintained by the organization has consistently not provided all or the same subset of the contraceptive coverage otherwise required at any point, consistent with any applicable State law, because of the religious beliefs of the organization.
> (3) [T]he group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) provides to plan participants a prescribed notice indicating that some or all contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.
> (4) The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with procedures detailed herein.

*Id.*

In accordance with the temporary safe harbor, the Government on March 21,

2012, began the process to amend the final regulations by issuing an Advance Notice of

Proposed Rulemaking ("ANPRM").  77 Fed. Reg. 16,503.  The ANPRM "present[ed]

questions and ideas," as well as solicited comment, "on how to provide women access

to the important preventive services at issue without cost sharing while accommodating

religious liberty interests."  *Id.*  The Government has received comments and has

asserted that it will publish a notice of proposed rulemaking, followed by additional

public comment.  *Id.*  The Government offers that amendments will be finalized before

the end of the temporary enforcement safe harbor on August 1, 2013.  *Id.*

4

Plaintiff Legatus is a non-profit organization whose mission is "[t]o study, live and spread the Catholic faith in our business, professional and personal lives." (Pls.' Compl. ¶¶ 23–24, Dkt. # 1.) Legatus is comprised of more than 4,000 members including individuals and professional organizations. (*Id.* ¶¶ 26–27.) Plaintiff Daniel Weingartz ("Weingartz") is the president of Plaintiff Weingartz Supply Company ("Weingartz Supply Co."), a secular, for-profit, family owned and operated corporation that sells outdoor power equipment and employs over 170 employees. (Decl. Daniel Weingartz ¶¶ 3–4, Dkt. # 13-3.) Weingartz is a practicing Catholic and active member of Legatus. (*Id.* ¶¶ 7, 9.) It is contrary to Catholic doctrine to use, pay for, or support the use of contraception. (*Id.* ¶ 15.) In accordance with his religious beliefs, Weingartz designed a health insurance policy for the employees of Weingartz Supply Co. to specifically exclude contraception. (Pls.' Compl. ¶ 45, Dkt. # 1.) Legatus engineered a similar health insurance policy that excludes contraception for its employees in observance of Catholic teaching. (*Id.* ¶ 37.) Plaintiffs argue that the HRSA Mandate, which forces them to choose between providing health insurance that includes contraception without cost-sharing or incurring a financial penalty,[1] substantially burdens their free exercise of religion. (*Id.* ¶ 89.) Under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.

---

[1]If an employer with at least 51 full-time employees does not offer health care coverage to its employees, then beginning in 2014 the employer is assessed an annual penalty of $2,000 multiplied by the number of full-time employees minus 30. Hinda Chaikind & Chris L. Peterson, *Summary of Potential Employer Penalties Under the Patient Protection and Affordable Care Act (PPACA)*, Congressional Research Service (2010), *available at* http:// www.shrm.org/ hrdisciplines/ benefits/ Documents/ EmployerPenalties.pdf.

§ 2000bb, Plaintiffs seek a preliminary injunction to prohibit the Government from enforcing the HRSA Mandate against them.

## II.  STANDARD

Plaintiffs bring their preliminary injunction motion under RFRA and not the Free Exercise Clause of the First Amendment.[2]  However, because RFRA and the Free Exercise Clause both seek to protect the same liberty interest—the free practice of one's religion—the court will take into account the jurisprudence of preliminary injunctions concerning First Amendment rights in deciding the present motion.

A preliminary injunction "is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  Courts should consider: "(1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction."  *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).  "These factors are not prerequisites but are factors that are to be balanced against each other."  *Overstreet*, 305 F.3d at 573.  But "when a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor."  *Jones*, 569 F.3d at 265.  In sum, "because the questions of harm to the parties

---

[2]The Free Exercise Clause states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.

and the public interest cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is . . . whether the [regulation] at issue is likely to be found constitutional." *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

## III.  DISCUSSION

### A.  Standing

As an initial matter, the court must determine whether Plaintiffs have standing to seek a preliminary injunction under RFRA enjoining the enforcement of the HRSA Mandate.  It is beyond question that Weingartz, as an individual, does.  *See* 42 U.S.C. § 2000bb-1(a).  The court will address in turn whether Weingartz Supply Co. and Legatus have standing.

In order to establish standing, three elements must be present: (1) the plaintiff suffered an "injury in fact," (2) there is a causal connection between the injury and the conduct complained of, and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete or particularized and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (internal citations omitted).

### *1.  Weingartz Supply Co.*

Weingartz Supply Co. is a secular, for-profit company that sells outdoor power equipment.  Weingartz Supply Co. asserts, without contradiction, that it is a "family owned and operated business," (Pls.' Compl. ¶ 74, Dkt. # 1.), led by Daniel Weingartz as its president, (*Id.* ¶ 41).

7

Neither the Supreme Court nor the Sixth Circuit has held that a for-profit corporation can assert its own rights under the Free Exercise Clause.  The text of RFRA extends its protections only to individuals, not corporations.  *See* 42 U.S.C. § 2000bb-1(a) ("Government shall not substantially burden a *person's* exercise of religion . . . .") (emphasis added).  However, at least one Circuit has held that "a corporation has standing to assert the free exercise rights of its owners" when that corporation is closely held and "'merely the instrument through and by which [the plaintiffs] exercise their religious beliefs.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1120 (9th Cir. 2009) (quoting *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 619 (9th Cir. 1988); *see also Townley*, 859 F.2d at 620 (holding that a corporation "present[ed] no rights of its own different from or greater than its owners' rights," "is an extension of the beliefs of [its owners], and for all purposes, the beliefs of [its owners] are the beliefs and tenets of the [corporation]," and that the corporation had standing to assert its owners' Free Exercise rights).  Further, the Supreme Court has famously recognized that First Amendment free-speech protection extends directly to corporations.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876, 900 (2010) ("The Court has . . . rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'").  It appears to the court that, although it is first impression for this Circuit, a strong case for standing, at least on a *Stormans* pass-through instrumentality theory, is sustainable.

Weingartz Supply Co. was founded as a family business and remains a closely held family corporation.  Accordingly, the court need not, and does not, decide whether

8

Weingartz Supply Co., as a for-profit business, has an independant First Amendment right to free exercise of religion.  For the purposes of the pending motion, however, Weingartz Supply Co. may exercise standing in order to assert the free exercise rights of its president, Daniel Weingartz, being identified as "his company."  (Pls.' Compl. ¶ 45, Dkt. # 1.)

### 2.  Legatus

The Government argues that Legatus has not suffered an injury in fact because the injury, at this time, is attenuated and speculative.  Under the temporary safe harbor, the Government asserts that it will not take any enforcement action against non-exempted, non-grandfathered health group plans that fail to cover some or all of the recommended contraceptive services if the plan is sponsored by an organization that meets four criteria:

> (1) The organization is organized and operates as a non-profit entity.
> (2) From February 10, 2012 onward, the group health plan established or maintained by the organization has consistently not provided all or the same subset of the contraceptive coverage otherwise required at any point, consistent with any applicable State law, because of the religious beliefs of the organization.
> (3) [T]he group health plan established or maintained by the organization (or another entity on behalf of the plan, such as a health insurance issuer or third-party administrator) provides to plan participants a prescribed notice indicating that some or all contraceptive coverage will not be provided under the plan for the first plan year beginning on or after August 1, 2012.
> (4) The organization self-certifies that it satisfies criteria 1-3 above, and documents its self-certification in accordance with procedures detailed herein.

Department of Health and Human Services, Guidance on the Temporary Enforcement Safe Harbor 3 (Aug. 15, 2012), *available at* http:// cciio.cms.gov/ resources/ files/ prev-

services-guidance-08152012.pdf.  The safe harbor is in effect until the first plan year

that begins on or after August 1, 2013.

During the safe harbor period, the Government argues that it intends to amend

the preventive services coverage regulations to accomplish the very purpose that

Legatus brings its suit—to accommodate, presumably by exemption, non-exempt, non-

grandfathered religious organizations' religious objections to covering contraceptive

services.  The Government began this process in March 2012 when it published the

ANPRM.

Legatus, as a non-profit organization that has not provided contraceptive

coverage from February 10, 2012, onward, qualifies for the safe harbor protection.

Consequently, Legatus asks the court to enjoin the Government from enforcing a rule

that is not yet finalized, which would, essentially, require the court to issue an advisory

opinion.  *Laird v. Tatum*, 408 U.S. 1, 14 (1972) ("[T]he federal courts established

pursuant to Article III of the Constitution do not render advisory opinions.") (citations

omitted).  Legatus argues that it has suffered a concrete injury because the

Government's promise of future rulemaking is non-binding, and the HRSA Mandate

could be enforced against them at any time.  However, there is no evidence to suggest

that the Government will abruptly quit the amendment process and enforce the HRSA

Mandate against Legatus.  Furthermore, the Government's actions are entitled to a

good faith presumption.  *See Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325

(5th Cir. 2009) ("Without evidence to the contrary, we assume that formally announced

changes to official governmental policy are not mere litigation posturing."); *Comcast

Corp. v. F.C.C.*, 526 F.3d 763, 762 n.2 (D.C. Cir. 2008) ("We must presume an agency

10

acts in good faith . . . .") (citations omitted).  Other courts deciding this identical issue have found that non-profit organizations protected under the safe harbor do not have standing because their injury is conjectural.  *Wheaton Coll. v. Sebelius*, No. 12-1169, 2012 WL 3637162, at *7 (D.D.C. Aug. 24, 2012) (denying standing because the preventive coverage rule pertaining to organizations that qualify for the temporary safe harbor is being amended and thus plaintiffs' injuries were hypothetical); *Belmont Abbey Coll. v. Sebelius*, No. 11-1989, 2012 WL 2914417, at *10 (D.D.C. July 18, 2012) ("Because an amendment to the final rule that may vitiate the threatened injury is not only promised but underway, the injuries alleged by Plaintiff are not 'certainly impending.'") (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Moreover, in the event that the Government acts in a way inimical to the rights Legatus seeks to protect—acts which the court presently views as doubtful—Legatus is not constrained from approaching the court with its concerns at that time.  But as the case is presently situated, the court is not persuaded that Legatus has standing to bring its claim.[3]

---

[3]Legatus, in a footnote in its reply brief, alternatively seeks associational standing if the court denies it Article III standing.  (Pls.' Reply Def.'s Opp'n Pls.' Mot. Prelim. Inj. at 15 n.6, Dkt. # 19.)  "An association has standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  Plaintiffs have failed to provide sufficient facts about Legatus's members and companies to establish that the members would have standing to sue in their own right or that their participation in this lawsuit is not required.  Legatus is comprised of 4,000 members from over 2,100 companies.  It unknown which of the 2,100 organizations are non-profit or for-profit companies, religiously-based or secular, closely held or not, or whether the organization qualifies for the temporary safe harbor—all of which affect each organization's standing.  While the court accepts that

11

## B.  Likelihood of Success on the Merits

RFRA states, "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.

### 1.  Substantial Burden

Catholicism teaches that it is a sin to use, provide, or otherwise support contraception.  (Pls.' Compl. ¶¶ 56, 85 Dkt. # 1.)  Weingartz, as a Catholic, asserts that having Weingartz Supply Co. provide or participate in health insurance that includes the FDA-approved contraceptive methods violates his sincerely-held religious beliefs.  The HRSA Mandate requires Weingartz Supply Co., as an employer with more than fifty full-time employees, to offer health insurance.  If Weingartz Supply Co. chooses not to provide coverage in order to avoid the HRSA Mandate, then beginning in 2014 Weingartz Supply Co. will incur an annual penalty equal to $2,000 multiplied by the number of Weingartz Supply Co.'s full-time employees minus 30.[4]  Plaintiffs therefore assert that the HRSA Mandate substantially burdens Weingartz's exercise of religion.

---

Catholic doctrine prohibits the use of contraception, the court does not know if every Legatus member adheres, strictly or otherwise, to that principle, nor does the court know how any possible differences in adherence might affect the formula used to determine associational standing.  Accordingly, Legatus is denied associational standing.

    [4]Hinda Chaikind & Chris L. Peterson, *Summary of Potential Employer Penalties Under the Patient Protection and Affordable Care Act (PPACA)*, Congressional Research Service (2010), *available at* http:// www.shrm.org/ hrdisciplines/ benefits/ Documents/ EmployerPenalties.pdf.

The Supreme Court has held that "putting substantial pressure on an adherent to modify his behavior and to violate his beliefs" substantially burdens a person's exercise of religion. *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981). "It is not within the judicial function and judicial competence to inquire" whether a party is correctly understanding his religious doctrine as "[c]ourts are not arbiters of scriptural interpretation." *Id.* at 716. Accordingly, courts often simply assume that a law substantially burdens a person's exercise of religion when that person so claims. *See, e.g.*, *U.S. v. Lee*, 455 U.S. 252, 257 (1982) ("We therefore accept appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith."); *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997) ("[W]e will assume that undoing May's dreadlocks imposes a substantial burden on his exercise of Rastafarianism."); *Hamilton v. Schriro*, 74 F.3d 1545, 1552 (8th Cir. 1996) ("[W]e assume that the regulations and policies at issue in the present case substantially burden Hamilton's exercise of his religion.").

Accordingly, and similarly, the court assumes that the Weingartz Plaintiffs are likely to show at trial that the HRSA Mandate substantially burdens the observance of the tenets of Catholicism.

### 2. Compelling Government Interest

The Government may substantially burden a person's exercise of religion "only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(1). The phrase "compelling interest" has been described differently by courts over time, but it has a core. The Supreme Court has described compelling interests as those "of the highest

13

order," *Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); "only those interests of the highest order and those not otherwise served," *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972);  "an overriding governmental interest," *U.S. v. Lee*, 455 U.S. 252, 258 (1982); and "the gravest abuses, endangering paramount interests," *Thomas v. Collins*, 323 U.S. 516, 530 (1945) (discussing the freedoms of speech and assembly).

At other times, the Supreme Court, the Sixth Circuit, and other circuit courts have referred to "a compelling state interest" as though it either defines itself or needs no further elaboration.  *See, e.g.*, *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011) (citing *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395 (1992)); *Sherbert v. Verner*, 374 U.S. 398, 406 (1963); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir. 1998); *S. Ridge Baptist Church v. Indus. Comm'n*, 911 F.2d 1203, 1206 (6th Cir. 1990).

The theme that emerges is the identification of "overriding," "paramount" governmental interests of the very "highest order."  Interests of a lesser magnitude, those that are not paramount, including those that are otherwise served, cannot be considered "compelling."

The Government advances two interests furthered by the HRSA Mandate.  First, the Government has an interest in promoting public health generally.  Courts have assumed, sometimes without deciding, that the improvement of public health is, at least in some instances, a compelling interest. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 310 (1978) ("It may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a

14

suspect classification."); *Buchwald*, 159 F.3d at 498 (citing *Bakke* to conclude that "public health is a compelling government interest"); *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011) ("The Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets."); (*Dickerson v. Stuart*, 877 F. Supp. 1556, 1559 (M.D. Fla. 1995) ("The State of Florida has a compelling interest in the health of expectant mothers and the safe delivery of newborn babies.").

Here, the Government, relying upon the IOM Report, argues that "a lack of contraceptive use has proven to have negative health consequences for both women and a developing fetus."  (Defs.' Opp'n Pls.' Mot. Prelim. at 25, Dkt. # 14.)  Passing quickly by the somewhat odd implication by the Government that the *use* of contraception could somehow have a beneficial impact on a "developing fetus" that contraceptive use is itself designed to avoid, the court understands the Government to argue that "women experiencing an unintended pregnancy may not immediately be aware that they are pregnant; their entry into prenatal care may be delayed, they may not be motivated to discontinue behaviors that present risks for the developing fetus; and they may experience depression, anxiety, or other conditions."  IOM Rep. at 103. The ability to control pregnancy spacing is also important, the Government argues, because short interpregnancy intervals are "associated with low birth weight, prematurity, and small-for-gestational-age births."  *Id.*

The Government's second interest is to "further[] gender equality," (Defs.' Opp'n Pls.' Mot. Prelim. at 26, Dkt. # 14), in two ways.  First, the Government argues that providing cost-free access to pregnancy prevention services, devices, and care

15

eliminates gender-based disparity in health care costs.  Women of reproductive age spend sixty-eight percent more in out-of-pocket health care costs than men.  Ann Kurth et al., *Reproductive and Sexual Health Benefits in Private Health Insurance Plans in Washington State*, 33 Fam. Plan. Persp. 153, 153 (2001) (citing Women's Research and Education Institute, Women's Health Insurance Costs and Experiences 1–8 (1994)).

The Government asserts that when health insurance plans impose cost-sharing for pregnancy-avoidance preventive care—in truth, the court adds, for care of any kind—the costs of such care can become a financial barrier that discourages or prevents access to it.  In the present circumstance, the Government argues that imposing costs of any kind serves to inhibit women from accessing and utilizing contraceptive methods.  IOM Rep. at 109.  The Government further argues that by eliminating cost-sharing for preventive care, and by better enabling women to decide whether or when to have children, the Government's aim to "advance gender equality" is served.  Women who control their reproductive functions are better able to make informed decisions regarding their careers and family.  It appears that the availability of oral contraception played an important role in increasing the presence of women in the workforce, bringing them into more direct economic competition with men, and eventually improving women's wages.  Martha J. Bailey et al., *The Opt-In Revolution? Contraception and the Gender Gap in Wages*, 4 Am. Econ. J.: Applied Econ. 225 (2012).  Female enrollment in graduate programs such as law, medical, and dental schools also increased, causally related to the availability of oral contraception, according to some researchers.  Claudia Goldin & Lawrence F. Katz, *The Power of the*

*Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. of Pol.

Econ. 730 (2002).  Another researcher concluded:

> Women's equal freedom of intimate association and liberty to invest in life
> plans on equal terms with men—plans for education, employment, or family
> that can span years—require that contraception be treated as a routine
> health benefit and not excluded from public or private health insurance
> coverage.  Women cannot participate in society, learn, earn, govern, and
> thrive equally without the ability to determine whether and when to become
> mothers.

Cornelia T.L. Pillard, *Our Other Reproductive Choices: Equality in Sex Education,*

*Contraceptive Access, and Work-Family Policy*, 56 Emory L.J. 941, 976 (2007).

The Supreme Court has echoed this sentiment, saying that "[t]he ability of

women to participate equally in the economic and social life of the Nation has been

facilitated by their ability to control their reproductive lives."  *Planned Parenthood of Se.*

*Pa. v. Casey*, 505 U.S. 833, 835 (1992).

Plaintiffs claim these interests are "tenuous" and "generic."  (Pls.' Reply Def.'s

Opp'n Pls.' Mot. Prelim. Inj. at 7–8, n.2, Dkt. # 19.)  Plaintiffs argue that the known

negative medical side effects of oral contraception outweigh the positive health benefits

provided by the full-range of FDA-approved contraceptive methods.  Plaintiffs also cite

the IOM Report, which notes that "research is limited" for some outcomes of unintended

pregnancies, as evidence that reducing the number of unintended pregnancies is not a

compelling interest.  IOM Rep. at 103.  Plaintiffs further argue that the interest of

promoting gender equality in the workforce is not "compelling" because many other

federal laws, such as the Pregnancy Disability Act, 42 U.S.C. § 2000e(k), and the

Family Medical Leave Act, 42 U.S.C. § 12631, already protect women from workplace

discrimination.  However, it does not appear that those laws improve or even address

17

the Government's stated goal of improving women's ability to decide whether and when to have children.  Plaintiffs do not contest that women of child-bearing age spend significantly more than men on out-of-pocket health care costs.

Plaintiffs further argue that none of the Government's proposed interests can be considered compelling because the HRSA Mandate does not apply to grandfathered plans.  A health plan is considered grandfathered if an individual was enrolled in the plan on March 23, 2010, the date on which the ACA was enacted.  75 Fed. Reg. 34,540.  About 193 million health plans were in existence on March 23, 2010, and presumably qualified as grandfathered.  *Id.*  Such plans were required to comply with some, but not all, of the ACA's health care reform provisions.  *Id.*  Health plans that lose their grandfathered status are subject to the HRSA Mandate.  *Id.* at 34,540–34,541. The Government estimates that between 39% and 69% of health plans will lose their grandfathered status by the end of 2013.  *Id.* at 34,552.  Plaintiffs assert that the Government undermined its compelling interests by not enforcing the HRSA Mandate against all health plans immediately when the ACA was enacted.

The Government responds that the ACA was "designed to ease the transition of the healthcare industry into the reforms established by the [ACA] by allowing for gradual implementation of reforms through a reasonable grandfathering rule."  *Id.* at 34,541.  "In making grandfathered health plans subject to some but not all of the health reforms contained in the [ACA], the statute balances its objective of preserving the ability to maintain existing coverage with the goals of expanding access to and improving the quality of health coverage."  *Id.* at 34,540.  Gradually implementing the ACA's health care provisions, instead of enforcing the entire law against all plans at the same time,

18

does not appear to be indicative of how important the Government considers the interests of regulating public health and furthering gender equality.  Instead, the grandfathering rule seems to be a reasonable plan for instituting an incredibly complex health care law while balancing competing interests.  To find the Government's interests other than compelling only because of the grandfathering rule would perversely encourage Congress in the future to require immediate and draconian enforcement of all provisions of similar laws, without regard to pragmatic considerations, simply in order to preserve "compelling interest" status.

There is a significant dispute, but the Government seems at least capable of persuading, to some level of satisfaction, that the HRSA Mandate promotes one, and perhaps both, interests and that each interest may be compelling.  Even so, the Government is also required to "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006).  The court must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants."  *Id.* at 431.  Plaintiffs argue that because religious non-profit organizations are exempt from the HRSA Mandate, granting an additional exemption to Weingartz Supply Co. and its 170 employees would not result in an appreciable harm to its interests.

The Government responds that the HRSA Mandate must apply to Weingartz Supply Co. because it is the only way to ensure that Weingartz Supply Co.'s employees

19

and their dependents receive without cost the full range of FDA-approved contraceptive methods.  The Government argues that providing a religious exemption to a secular, for-profit company would open the door for owners of other secular businesses to request religious exemptions to federal laws under RFRA, thereby essentially imposing the owners' religious beliefs on their employees who may not share their owners' convictions.

The Government further argues the slippery slope: allowing the exemption would widen enormously, it says, the scope of RFRA's protection, providing owners of secular, for-profit companies the power currently reserved for religious organizations under Title VII to claim religion-grounded exceptions to federal laws.  *See* 42 U.S.C. § 2000e-1(a) ("This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.").  Granting an exemption to Weingartz Supply Co. would, of course, affect only its 170 employees and their dependents.  Considering this in the context of a United States population of more than 311 million, an exemption for a few hundred seems a minuscule hindrance to whatever interest, compelling or otherwise, the Government may seek to advance.  But owners of other secular, for-profit companies could perhaps qualify for equivalent exemptions, serving to undermine various interests the Government presently seeks to advance.

While Plaintiffs argue generally that contraceptive services and products are widely available for little if any cost, it remains unproven and unclear to the court at this early stage of the case; *i.e.*, how can Weingartz Supply Co.'s employees alternatively

acquire, without cost-sharing, the full range of FDA-approved contraceptive methods in the absence of the HRSA Mandate?  *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 224–25 (1972) (holding that the Government's interest in compulsory school attendance through age sixteen, which substantially burdened the Amish practice of declining to send their children to formal education after eighth grade, failed the compelling interest test because the Amish continued to provide vocational education for their children in their adolescent years).  If, consistent with *Yoder*, Plaintiffs were to prevail on their alternate means argument, they would overwhelm, or at least greatly reduce, the impact of the Government's compelling interest argument.  The court has no doubt that every level of Government has an interest in promoting public health as a general matter, but remains uncertain that the Government will be able to prove a *compelling* interest in promoting the specific interests at issue in this litigation.

### 3.  Least Restrictive Means

If the Government meets the compelling interest test, it next would be required to then prove that it has chosen "the least restrictive means" of furthering that interest.  42 U.S.C. § 20000bb-1(b)(2).  What constitutes the "least restrictive means" and how it is determined is subject to significant debate.  The Supreme Court has held that statutes fail the least restrictive means test when they are "overbroad" or "underinclusive."  *See Church of the Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).  The Government argues that the HRSA Mandate is neither overbroad nor underinclusive because it appropriately balances what the Government posits as the competing interests at stake: allowing exemption for non-profit religious organizations while

21

requiring secular, for-profit companies to abide by the HRSA Mandate.  As the Supreme

Court explained in *United States v. Lee*:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs.  When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.

455 U.S. 252, 261 (1982).

The Sixth Circuit describes the least restrictive means test as "the extent to which

accommodation of the [plaintiff] would impede the state's objectives," and explains that

"[w]hether the state has made this showing depends on a comparison of the cost to the

government of altering its activity to allow the religious practice to continue unimpeded

versus the cost to the religious interest imposed by the government activity."  *S. Ridge

Baptist Church v. Indus. Comm'n*, 911 F.2d 1203, 1206 (6th Cir. 1990).  Granting

Weingartz Supply Co. an exemption would impede marginally the Government's

interests.  However, it is unclear whether the "cost" to the Government of being required

to honor an exemption—a cost expressed in terms of its inability not to prohibit some

behavior, but to affirmatively require an employer to provide cost-free access to

contraception—is greater than the spiritual "cost" to the Weingartz Plaintiffs were the

HRSA Mandate to be fully enforced.  The cost to Plaintiffs appears provably substantial.

The cost to the Government appears provably small in the context of this single case,

but a larger cost might be found somewhere downstream, along the imagined slippery

slope.

The Tenth Circuit has extensively discussed the inherent difficulty of the least restrictive means test:

> [T]he notion that the government must prove that it has used the "*least restrictive means*," or that "*no* alternative forms of regulation" would suffice to serve its interests, is an odd creature. On its face, it requires the government to prove a negative—that no matter how long one were to sit and think about the question, one could never come up with an alternative regulation that adequately serves the compelling interest while imposing a lesser burden on religion. This is a formidable task. . . . In the abstract, such a thing can never be proven conclusively; the ingenuity of the human mind, especially if freed from the practical constraints of policymaking and politics, is infinite.
>
> Thus, a number of courts that have considered the least restrictive means question . . . have held that the government should not be required "to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA." *Hamilton v. Schriro,* 74 F.3d 1545, 1556 (8th Cir. 1996) (characterizing such a requirement as a "herculean burden"); *accord Fowler v. Crawford,* 534 F.3d 931, 940 (8th Cir. 2008) (considering the identical language of the Religious Land Use and Institutionalized Persons Act ("RLUIPA")); *Spratt v. R.I. Dep't of Corr.,* 482 F.3d 33, 41 n.11 (1st Cir. 2007) (RLUIPA claim); *May v. Baldwin,* 109 F.3d 557, 563 (9th Cir. 1997) (RFRA claim). Not requiring the government to do the impossible—refute each and every conceivable alternative regulation scheme—ensures that scrutiny of federal laws under RFRA is not "strict in theory, but fatal in fact." Thus the government's burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record.

*United States v. Wilgus*, 638 F.3d 1274, 1288–89 (10th Cir. 2011) (internal citations omitted). The *Wilgus* test effectively exempts the Government from being required to affirmatively prove what the statute requires, *i.e.*, that it has employed "the least restrictive means of furthering [its] compelling governmental interest," 42 U.S.C. § 2000bb-1(b)(2), casting the burden on a plaintiff to offer "alternative schemes" which then are subject to being refuted, with evidence, by the Government. The Government argues that *Wilgus* strikes an appropriate balance between retaining some burden on

the Government without requiring it "to do the impossible."  Neither the Supreme Court

nor the Sixth Circuit has adopted *Wilgus*.

Plaintiffs have thus far proposed two alternatives to the HRSA Mandate: (1)

women may obtain contraceptive needs at community health centers; or (2) the

Government should directly provide women with preventive care through an

administrative agency.  The Government argues that neither is feasible.  More than half

(57%) of publicly funded health centers cannot provide certain contraceptive methods

due to the high cost, Jennifer J. Frost, et al., *Variation in Service Delivery Practices*

*Among Clinics Providing Publicly Funded Family Planning Services in 2010*,

Guttmacher Institute 43 (2012), *available at* http:// www.guttmacher.org/ pubs/

clinic-survey-2010.pdf, meaning women would be unable to obtain free access to "the

full range of FDA-approved contraceptive methods," depending on their local health

center's financial situation.  Community centers also do not provide free contraception

to all women.  Instead, these centers typically implement a sliding scale fee program, in

which a patient's fee is determined by her annual income, household size, and desired

treatment.  *See, e.g.*, *Sliding Scale Services*, Mt. Baker Planned Parenthood, http://

www.plannedparenthood.org/ mbpp/ files/ mt-baker/

Family_Planning_Sliding_Scale_Service.pdf (last visited Oct. 11, 2012).  The court

engaged the Government in some preliminary discussion at oral argument about such

costs being made refundable by the well-known scheme of credits offered through the

existing Internal Revenue System, but no definitive response or analysis has thus far

been presented.

24

Plaintiffs' alternative prospect of establishing a separate agency whose purpose would be to provide contraception to women raises a host of administrative and logistical problems, well pointed-out by the Government's response, and does not appear practical.

Analyzing the least restrictive means under the Supreme Court, Sixth Circuit, and Tenth Circuit tests, it appears to the court possible, but not strongly so, that the Government may meet its burden at trial.

Neither Plaintiffs nor the Government have shown a strong likelihood of success on the merits.

## C.  Irreparable Harm to Plaintiff

Will Plaintiffs suffer irreparable harm if an injunction is not granted?  Violation of a First Amendment right in itself constitutes irreparable harm.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  When First Amendment freedoms are at risk, the irreparable harm factor "merges" with the likelihood of success, such that if the plaintiff shows he is likely to succeed on the merits, he has simultaneously proven he will suffer an irreparable harm.  *See McNeilly v. Land*, 684 F.3d 611, 620–21 (6th Cir. 2012) ("Once a probability of success on the merits was shown, irreparable harm followed. . . .  Because [the plaintiff] does not have a likelihood of success on the merits, . . . his argument that he is irreparably harmed by the deprivation of his First Amendment rights also fails."); *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("Thus, to the extent that [the plaintiff] can establish a substantial likelihood of success on the merits of its First Amendment claim, it also has established

25

the possibility of irreparable harm as a result of the deprivation of the claimed free speech rights.").

The possibility that the Government will be able to convince the court of either the compelling nature of the interests it seeks to advance, or that the means it has chosen are the least restrictive, is negatively correlated with Plaintiffs' likelihood of success on the merits.  As the court concluded in the preceding section, Plaintiffs have made some showing, but not strongly so, of a likelihood of success on the merits, and the Government has made some showing, but not strongly so, of advancing a "compelling" interest by the "least restrictive means."  The potential for harm to Plaintiffs exists, and with the showing Plaintiffs have made thus far of being able to convincingly prove their case at trial, it is properly characterized as irreparable.

### D.  Impact on Public Interest

"The public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties."  *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009).  Similar to the irreparable harm analysis, therefore, "the determination of where the public interest lies also is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge because it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distributing Co.*, 154 F.3d at 288; s*ee also McNeilly*, 684 F.3d at 621 ("Given the failure to show a substantial likelihood of success on the merits of [the plaintiff's] claim that the contribution limits are unconstitutional, the district court's conclusion that 'the [adverse] effect on the public and the public interest' from enjoining the enforcement of the statute . . . 'would be very significant' is also proper.").

26

A preliminary injunction would serve the public interest to the extent that each party has made some showing of a likelihood of success on the merits, as described in section C above.

### E.  Balancing of Harm

Finally, the court must balance the harm to Plaintiffs if the injunction were denied with the harm to the Government if the injunction is granted.  The purpose of the balance of harms test is

> to underscore the flexibility which traditionally has characterized the law of equity. It permits the district court, in its discretion, to grant a preliminary injunction *even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim*, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.

*Jones v. Caruso*, 569 F.3d at 277 (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.,* 679 F.2d 100, 104 (6th Cir. 1982)) (emphasis added).

The court began the motion hearing by observing that this case will continue regardless of whether a preliminary injunction is granted, to which both parties agreed. Due to the legal and factual issues involved, a discovery schedule of at least 90 to 120 days will be required, after which a trial must be held (unless dispositive motion practice occurred, which would require its own, separate time line of a number of months).  No ruling on the merits can occur, therefore, until well after January 1, 2013, the date on which Weingartz and Weingartz Supply Co. will be required to abide by the HRSA Mandate absent an injunction.

The fact that a ruling on the merits will unquestionably occur after January 1, 2013, is significant.  Denying Plaintiffs a preliminary injunction will effectively grant the

27

Government a default success on the merits—at least until Weingartz Supply Co. can change its health insurance policy to exclude contraception if Weingartz were to succeed at trial.  As already discussed, Plaintiffs have shown some, but not a *strong* likelihood of success on the merits.  The Government is in a similar position with respect to proof of compelling interest and least restrictive means, about both of which there remain serious but unanswered questions.  Furthermore, the court reiterates that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Government will suffer some, but comparatively minimal harm if the injunction is granted.  *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (noting that "the government presumably would be substantially harmed if enforcement of a *constitutional* law . . . were enjoined").

The harm in delaying the implementation of a statute that may later be deemed constitutional must yield to the risk presented here of substantially infringing the sincere exercise of religious beliefs.  The balance of harms tips strongly in Plaintiffs' favor.  A preliminary injunction is warranted.

## IV.  CONCLUSION

IT IS ORDERED that "Plaintiffs' Motion for a Preliminary Injunction" [Dkt. # 13] is GRANTED with respect to Daniel Weingartz and Weingartz Supply Company and DENIED WITHOUT PREJUDICE with respect to Legatus.

Plaintiffs are DIRECTED to submit forthwith a form of Preliminary Injunction consistent with this Opinion.

28

The Government is DIRECTED to file a brief statement describing the status of the amendment process for final regulations occurring under the temporary enforcement safe harbor not later than the first Monday of each month.

The court will set a scheduling conference by separate order.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  October 31, 2012

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, October 31, 2012, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522