IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

LEGATUS;
WEINGARTZ SUPPLY COMPANY; and
DANIEL WEINGARTZ, President of Weingartz
Supply Company,

      Plaintiffs,

      v.

KATHLEEN SEBELIUS, Secretary of the
United States Department of Health and
Human Services; UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES;
THOMAS PEREZ, Secretary of the United States
Department of Labor; UNITED STATES
DEPARTMENT OF LABOR; JACK LEW, Secretary
of the United States Department of the Treasury; and
UNITED STATESDEPARTMENT OF THE
TREASURY,

      Defendants.
_____/

Case No. 2:12-cv-12061

FIRST AMENDED
COMPLAINT

Judge Robert H. Cleland

## **FIRST AMENDED COMPLAINT**

Comes now Plaintiffs Legatus, Weingartz Supply Company, and Daniel
Weingartz (collectively "Plaintiffs"), by and through undersigned counsel, bring
this Complaint against the above-named Defendants, their employees, agents, and
successors in office, and in support thereof state the following upon information
and belief:

1

## NATURE OF THE ACTION

1.      This is a case about religious freedom.  Thomas Jefferson, a Founding Father of our country, principal author of the Declaration of Independence, and our third president, when describing the construct of our Constitution proclaimed, "No provision in our Constitution ought to be dearer to man than *that which protects the rights of conscience* against the enterprises of the civil authority."  Letter from Thomas Jefferson, United States Office of the President, to the Soc'y of the Methodist Episcopal Church at New London, Conn. (Feb. 4, 1809) *cited in People v. Dejonge*, 442 Mich. 266, 278 (1993) (emphasis added).

2.      This is a challenge to regulations ostensibly issued under the "Patient Protection and Affordable Care Act" (Pub. L. 111-148, March 23, 2010, 124 Stat. 119) and the "Health Care and Education Reconciliation Act" (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (collectively known and hereinafter referred to as the "Affordable Care Act") that force individuals to violate their deepest held religious beliefs.

3.      The Affordable Care Act, through a Mandate from the United States Department of Health and Human Services, attacks and desecrates a foremost tenet of the Catholic Church, as stated by Pope Paul VI in His 1968 encyclical *Humanae Vitae*, that "any action which either before, at the moment of, or after sexual

intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception, abortion, and abortifacients—is a grave sin.

4.     One of the provisions of the Affordable Care Act to mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directs the Secretary of the United States Department of Health and Human Services to determine what would constitute "preventive care" under the mandate. 42 U.S.C § 300gg–13(a)(4).

5.     Without notice of rulemaking or opportunity for public comment, the United States Department of Health and Human Services, the Secretary of Health and Human Services, the United States Department of Labor, the Secretary of Labor, the United States Department of Treasury, and the Secretary of the Treasury (collectively "Defendants") adopted and promulgated an interim final rule ("the Mandate"), which requires that all "group health plan[s] and . . . health insurance issuer[s] offering group or individual health insurance coverage" provide all FDA-approved contraceptive methods and procedures. 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130.

6.     The Mandate requires all group health plans (i.e. employee health insurance plans) and insurance issuers (e.g. Blue Cross/Blue Shield of Michigan)

to provide contraception, abortion, and abortifacients in all of its insurance plans, group and individual.

7.      Health Resources and Services Administration also issued guidelines adopting the Institute of Medicine ("IOM"), a private entity hired by Defendants, recommendations.  (http://www.hrsa.gov/womensguidelines).

8.      Under the IOM guidelines, the Mandate requires *all* group health plans and insurance insurers to provide not only contraception, but also abortion, because certain drugs and devices such as the "morning-after pill," "Plan B," and "ella" come within the Mandate's and Health Resources and Services Administration's definition of "Food and Drug Administration-approved contraceptive methods" despite their known abortifacient mechanisms of action.

9.      The Mandate forces employers and individuals to violate their religious beliefs because it requires employers and individuals to pay for insurance from insurance issuers which facilitate, fund and directly provide for drugs, devices, and services which violate their deeply held religious beliefs.

10.     Since under the Mandate all employer group plans and insurance issuers must provide what the United States Department of Health and Human Services has deemed "preventive care," employers and individuals are stripped of any choice between insurance issuers or insurance plans to avoid violating their religious beliefs.

4

11.     Defendants, in an unprecedented despoiling of religious rights, forces religious employers and individuals, who believe that funding and providing for contraception, abortion, and abortifacients is wrong, to facilitate and participate in acts that violate their beliefs and their conscience—and are forced out of the health insurance market in its entirety in order to comply with their religious beliefs.

12.     Plaintiffs seek a Preliminary Injunction, Permanent Injunction, and Declaratory Judgment against Defendants' implementation and enforcement of provisions of the regulations promulgated under the Affordable Care Act, specifically the Mandate.  The Mandate violates Plaintiffs' rights to the free exercise of religion, freedom under the Establishment Clause, and freedom of speech under the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act.

13.     The Affordable Care Act's contraception, abortion, and abortifacient mandate violates the rights of Plaintiff Legatus as a non-profit, Catholic organization, and the individuals that comprise Legatus, such as its employees and its over 4,000 members comprised of devoutly Catholic business persons and their spouses from over 2,100 Catholic-run companies in the United States.

14.     Plaintiff Daniel Weingartz is an active member of Legatus and is the President of Plaintiff Weingartz Supply Company, a for-profit, company with over 50 full-time employees required to provide health insurance under the Affordable

Care Act under penalty of heavy fines and therefore forced under the Mandate to provide and fund contraceptives, abortion, and abortifacients, which violates his deeply held religious beliefs.

15.     Defendants refused to exempt religious, non-profit organizations, such as Plaintiff Legatus.    Instead, Defendants have created an inadequate "accommodation" for religious, non-profit organization which still requires that such organizations facilitate coverage for contraceptives, abortion, and abortifacients contrary to their sincerely held religious beliefs.

16.     Defendants have created no exemption or accommodation for for-profit companies or their owners, and have chosen to force for-profit companies or their owners into violating their religious beliefs.

17.     Plaintiffs bring this action to vindicate not only their own rights, but also to protect the rights of all Americans who care about our Constitutional guarantees of free exercise of religion and their freedom of speech, as well as the protection of innocent human life.

## JURISDICTION AND VENUE

18.     This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1346.

19.     Plaintiffs' claims for declaratory and preliminary and permanent injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 28 U.S.C. § 2000bb-1, and by the general legal and equitable powers of this Court.

20.     Venue is proper under 28 U.S.C. § 1391(e) because this is the judicial district in which Plaintiffs are located.

## PLAINTIFFS

21.     Plaintiff Legatus is an organization incorporated under the laws of the State of Michigan.

22.     Plaintiff Legatus is registered at One Ave Maria Drive, Ann Arbor, MI 48106.

23.     Plaintiff Legatus is recognized by the Internal Revenue Service as a 501(c)(3), non-profit organization.

24.     "Legatus" is the Latin word for ambassador, and Plaintiff Legatus is a Catholic organization which provides "for its members to become ambassadors for the Catholic Faith they share in common."  (http://www.legatus.org/).

25.     The mission of Legatus is "[t]o study, live and spread the Catholic faith in our business, professional and personal lives."  (http://www.legatus.org/).

26.     Plaintiff Legatus "is an international organization of practicing Catholic laymen and laywomen, comprised of Chief Executive Officers,

Presidents, Managing Partners and Business Owners, with their spouses, from the business community and professional enterprises." Legatus Amended and Restated International Bylaws § 2.1.

27.    Plaintiff Legatus is comprised of over 4,000 members, including 2,124 dues paying members and their member spouses.

28.    Plaintiff Legatus has a total of 73 chapters in the United States located in 31 states with 3 international chapters.

29.    Plaintiff Legatus has three chapters located in Southeastern Michigan, including chapters located in the cities of Detroit and Ann Arbor.

30.    The members of Legatus join the organization with purpose of deepening and strengthening their Catholic faith. Legatus nurtures spiritual growth in its members' Catholic beliefs by fostering a stronger relationship with Jesus Christ and by educating its members in the teachings of the Catholic Church.

31.    Plaintiff Legatus, its employees, and its members follow the teachings of the Catholic faith as defined by the Magisterium (teaching authority) of the Catholic Church. Plaintiffs carry and live out their religious beliefs daily by helping and assisting their members follow the teachings of the Catholic Church and strengthen their faith.

32. The members of Legatus share religious beliefs that forbid them from facilitating, providing, participating in, paying for, training others to engage in, or otherwise supporting contraception, abortion, and abortifacients.

33. Plaintiff Legatus and its members follow with devotion the teachings and the tenets of the Catholic Church.

34. Furthermore, Plaintiff Legatus provides education to its members pertaining to the teachings and tenets of the Catholic Faith.

35. Prior to the issuance of the Mandate, Plaintiff Legatus engineered an insurance policy with Blue Cross/Blue Shield of Michigan and through the Ave Maria Foundation located in Ann Arbor, Michigan which specifically excluded contraception, abortion, and abortifacients, and exempts Plaintiff from facilitating, providing, paying, contributing, or supporting contraception and contraception, abortion, and abortifacients for others.

36. Plaintiff Legatus obtained these exclusions due to the deeply held religious beliefs of its members and to comply with the organization's mission and purpose.

37. Plaintiff Legatus' employees receive insurance under this engineered insurance policy with Blue Cross/Blue Shield of Michigan which specifically excluded contraception, abortion, and abortifacients, and exempts Plaintiff from

facilitating, providing, paying, contributing, or supporting contraception and contraception, abortion, and abortifacents for others.

38.   Plaintiff Weingartz Supply Company is incorporated in the State of Michigan and under the laws of the State of Michigan.

39.   Plaintiff Weingartz Supply Company is located at 46061 Van Dyke, Utica, Michigan, 48371, with five locations in the Metro Detroit area including Ann Arbor, Michigan.

40.   Plaintiff Daniel Weingartz is an individual and a citizen of the State of Michigan and the United States.

41.   Plaintiff Daniel Weingartz is the President of Weingartz Supply Company.  He is responsible for setting all policies governing the conduct of all phases of business of Weingartz Supply Company, its subsidiaries, and the Weingartz family companies.

42.   Plaintiff Daniel Weingartz is an active member of Legatus.

43.    Plaintiff Daniel Weingartz holds religious beliefs which forbid him from facilitating, providing, participating in, paying for, training others to engage in, or otherwise supporting contraception, abortifacients, and abortion.

44.   Plaintiff Weingartz Supply Company, its subsidiaries, and the Weingartz family companies are secular companies led by Plaintiff Daniel Weingartz, who is a devout Catholic.

45.    Plaintiff Daniel Weingartz through his company Plaintiff Weingartz Supply Company engineered a self- insured group policy with third party administrator Blue Cross/Blue Shield of Michigan which specifically excluded contraception, and abortion and exempts Plaintiff from facilitating, providing, paying, contributing, or supporting contraception, or abortion for others.

46. Plaintiff Daniel Weingartz and his company Plaintiff Weingartz Supply Company ensured that their insurance policy contained these exclusions to reflect their deeply held religious beliefs.

47.    Based on the teachings of the Catholic Church, and their deeply held religious beliefs, Plaintiffs do not believe that contraception, or abortion are properly understood to constitute medicine, health care, or a means of providing for the well being of persons.  Indeed, Plaintiffs believe these procedures involve gravely immoral practices, specifically the intentional destruction of innocent human life.

**<u>DEFENDANTS</u>**

48.    Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the Mandate.

49.    Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS").  In this capacity, she has

responsibility for the operation and management of HHS.  Defendant Sebelius is sued in her official capacity only.

50.  Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

51.  Defendant Thomas Perez is the Secretary of the United States Department of Labor.  In this capacity, he holds responsibility for the operation and management of the United States Department of Labor.  Defendant Perez is sued in his official capacity only.

52.  Defendant United States Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

53.  Defendant Jack Lew is the Secretary of the United States Department of the Treasury. In this capacity, he holds responsibility for the operation and management of the United States Department of Treasury.  Defendant Lew is sued in his official capacity only.

54.  Defendant United States Department of Treasury is an executive agency of the United States government and is responsible for the promulgation,

administration, and enforcement of the regulation which is the subject of this lawsuit.

## FACTUAL ALLEGATIONS

**Plaintiffs' Religious Beliefs**

55.    Plaintiffs hold and actively profess religious beliefs in accordance with the traditional Christian teachings on the sanctity of life.  Plaintiffs believe that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious, from the moment of conception.  Plaintiffs therefore believe that abortion ends a human life and is a grave sin.  Therefore, Plaintiffs sincerely believe that facilitating access to or providing contraception, abortion inducing drugs (abortifacients), or abortion through their employee group insurance plan is a grave sin.

56.    Plaintiffs' religious beliefs also include traditional Christian teaching on the nature and purpose of human sexuality. In particular, Plaintiffs believe, in accordance with Pope Paul VI's 1968 encyclical *Humanae Vitae*, that human sexuality has two primary purposes: to "most closely unit[e] husband and wife" and "for the generation of new lives."  Accordingly, Plaintiffs believe and actively profess, with the Catholic Church, that "[t]o use this divine gift destroying, even if only partially, its meaning and its purpose is to contradict the nature both of man and of woman and of their most intimate relationship, and therefore it is to

contradict also the plan of God and His Will." Therefore, Plaintiffs believe and teach that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception—is a grave sin.

57.    Furthermore, Plaintiffs subscribe to authoritative Catholic teaching about the proper nature and aims of health care and medical treatment. For instance, Plaintiffs believe, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life."

58.    Plaintiffs hold a sincere religious objection to facilitating access to contraception, abortifacients, or abortion. This objection includes all drugs, devices, and services that constitute contraception, abortifacients, or abortion, including "emergency contraceptives" Plan B and ella.

59.    Because of Plaintiffs' religious convictions concerning the sanctity of life, Plaintiffs cannot participate in any scheme to facilitate or provide access to contraceptive or abortifacient drugs, services or devices.

60.    Recently, leaders within the Catholic Church have publicly spoken out about how the Mandate is a direct violation of Catholic Faith.

61.     Cardinal Timothy Dolan, Archbishop of New York and President of the United States Conference of Catholic Bishops wrote, "Since January 20 [2012], when the final, restrictive HHS Rule was first announced, we have become certain of two things: religious freedom is under attack, and we will not cease our struggle to protect it.  We recall the words of our Holy Father Benedict XVI to our brother bishops on their recent ad limina visit: 'Of particular concern are certain attempts being made to limit that most cherished of American freedoms, the freedom of religion.'  We have made it clear in no uncertain terms to the government that we are not at peace with its invasive attempt to curtail the religious freedom we cherish as Catholics and Americans."  (http://www.usccb.org, last visited Aug. 29, 2013).

62.     Archbishop Charles J. Chaput, the Archbishop of Philadelphia, has expressed that the Affordable Care Act and the Mandate seek "to coerce Catholic employers, private and corporate, to violate their religious convictions . . . [t]he HHS mandate, including its latest variant, is belligerent, unnecessary, and deeply offensive to the content of Catholic belief . . . The HHS mandate needs to be rescinded.  In reality, no similarly aggressive attack on religious freedom in our country has occurred in recent memory . . . [t]he HHS mandate is bad law; and not merely bad, but dangerous and insulting.  It needs to be withdrawn—now."

(http://the-american-catholic.com/2012/02/14/archbishop-chaput-hhs-mandate-dangerous-and-insulting/, last visited Aug. 29, 2013).

63.     Leaders in the Catholic Church have also stated that the "accommodation" made for non-profit religious organizations, such as Plaintiff Legatus, is a failed accommodation as it does alleviate the direct violation of the Catholic Faith imposed by Mandate.

64.     Cardinal Timothy Dolan has stated in critique of the so-called accommodation, "there is only one policy, and it is the one sponsored by the Catholic employer.  The objectionable items will still be paid by virtue of the fact that an employee belongs to the Catholic employer's plan." (http://www.usccb.org/news/2013/13-137.cfm, last visited Aug. 29, 2013); *see also* (http://www.usccb.org/issues-and-action/religious-liberty/conscience-protection/upload/Feb2013-_Version_Mandate_Factsheet.pdf, last visited Aug. 29, 2013).

65.     Plaintiffs'' insurance plans do not cover contraception, abortifacients, or medical abortions.

**Plaintiff Legatus**

66.     Plaintiff Legatus, a Catholic organization which adheres to the teachings of the Catholic Church, has 17 full-time employees and 52 part-time employees.

67. Plaintiff Legatus is a non-profit organization.

68. Plaintiff Legatus is composed of over 4,000 members and Catholic business persons and their spouses who represent over 2,100 companies, many companies being comprised of 50 or more full-time employees.

69. Plaintiff Legatus purchases group insurance through insurance issuer Blue Cross/Blue Shield of Michigan and provides this insurance to its full-time employees.

70. Plaintiff Legatus has striven over the years to provide its employees with employee health coverage superior to coverage generally available in the Michigan market in order to be a competitive employer.

71. Plaintiff Legatus specifically designed a health insurance plan with Blue Cross/Blue Shield of Michigan to exclude contraception, abortion, and abortifacients in line with the religious beliefs of the members of Legatus and in line with the mission of Legatus, a Catholic organization.

72. Moreover, as part of its religious commitment to the authoritative teachings of the Catholic Church, Plaintiff Legatus educates its members about the teachings of the Catholic Church and steadfastly avoids practices that subvert the teaching of the Catholic Church such as providing or funding drugs, devices, services or procedures inconsistent with its faith.

73.     Plaintiff Legatus has taken great pains through the years to ensure that its employees' insurance plans do not cover contraception or abortion.

74.     Plaintiff Legatus cannot facilitate, provide, fund, or participate in health care insurance which covers artificial contraception, abortion, or abortifacients, or related education and counseling, without violating its deeply held religious beliefs.

75.     Plaintiff Legatus cannot provide information or guidance to its employees or its members regarding artificial contraception, abortion, abortifacients or related education and counseling, without violating their deeply held religious beliefs.

76.     Plaintiff Legatus exists through its members, such as Plaintiff Daniel Weingartz, who seek advice regarding business practices in compliance with their religious views.   Pursuant to Plaintiff Legatus' mission, Plaintiff Legatus will continue to adhere to, disseminate, and report reliable Catholic teachings on morality and practices in its business dealings and in its advice to employees and members, as its Mission Statement has declared since its inception.

**Plaintiffs Weingartz Supply Company and Daniel Weingartz, President of Weingartz Supply Company**

77.     Plaintiff Daniel Weingartz, the President of Plaintiff Weingartz Supply Company, is an active member of Plaintiff Legatus.

78.     As a member of Legatus, Plaintiff Daniel Weingartz is an ambassador of the Catholic Faith and follows the teachings of the Catholic Church.

79.     Plaintiff Weingartz Supply Company, along with W & P Management LLC and its subsidiaries employ a total of 170 employees including 60 part-time employees.

80.     Plaintiff Weingartz Supply Company and its subsidiary companies are family owned and operated and have been for the last 65 years.

81.     Plaintiff Weingartz Supply Company and its subsidiaries are for-profit, secular companies.

82.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company and its subsidiaries share a common mission of conducting their business operations with integrity.

83.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company adhere to fair, ethical, and honest business practices with both its employees and its valued customers.

84.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company follow the teachings, mission, and values of the Catholic faith.

85.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company have a self-insured group plan for its employees through its subsidiary W & P Management, LLC through insurance agent Brown & Brown Detroit and third

party administrator Blue Cross/Blue Shield of Michigan, and currently provide this insurance to its full-time employees.

86.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company have striven over the years to provide its employees with employee health coverage superior to coverage generally available in the Michigan market in order to be a competitive employer.

87.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company specifically designed their self-insured group health insurance plan to exclude contraception, abortion, and abortifacients in line with the religious beliefs of Plaintiff Daniel Weingartz, the Weingartz family, the mission of the Catholic Church, and Legatus, a Catholic organization to which Plaintiff Daniel Weingartz belongs.

88.     As part of their religious commitment to the authoritative teachings of the Catholic Church, Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company steadfastly avoid practices that subvert the teaching of the Catholic Church such as facilitating access to, providing, or funding drugs, devices, services or procedures inconsistent with their faith.

89.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company have taken great pains through the years to ensure that its employees' insurance plans do not cover contraception, abortion, or abortifacients.

90.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company cannot facilitate access to, provide, fund, or participate in health care insurance which covers artificial contraception, abortion, or abortifacients, or related education and counseling, without violating their deeply held religious beliefs.

91.     Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company cannot provide information or guidance to its employees regarding artificial contraception, abortion, abortifacients or related education and counseling, without violating their deeply held religious beliefs.

92.     With full knowledge of these aforementioned beliefs, Defendants issued the Mandate that runs roughshod over Plaintiffs' religious beliefs, and the beliefs of millions of other Americans.

93.     The Mandate not only forces Plaintiffs to facilitate access to contraception, abortion, and related education and counseling as health care, but also subverts the expression of Plaintiffs' religious beliefs, and the beliefs of millions of other Americans, by forcing Plaintiffs to fund, promote, and assist others to acquire services which Plaintiffs believe involve gravely immoral practices, including the destruction of innocent human life.

94.     The Mandate unconstitutionally coerces Plaintiffs to violate their deeply-held religious beliefs under threat of directly violating their consciences, in addition to any imposed fines and penalties.  The Mandate also forces Plaintiffs to

fund government-dictated speech that is directly at odds with their own speech and religious beliefs.  Having to pay a fine to the taxing authorities or being entirely forced out of the insurance market in order to ensure the privilege of practicing one's religion or controlling one's own speech substantially burdens Plaintiffs' religious liberty and freedom of speech under the First Amendment.

95.   The Mandate strips the Plaintiffs of any choice to select an insurance plan that does not lead to access to contraception, abortion, and abortifacients, as the Mandate requires that all group insurance plans and insurance issuers provide this coverage or at minimum facilitate access to this coverage.

96.   Plaintiffs' plans are not "grandfathered" and will be subject to the provisions of the Mandate.  Plaintiffs' health care plans are not a grandfathered plan under the Affordable Care Act for multiple reasons, including, but not limited to, the following: (1) the health care plans do not include the required "disclosure of grandfather status" statement; (2) Plaintiffs do not take the position that its health care plans are grandfathered plans and thus do not maintain the records necessary to verify, explain, or clarify their status as grandfathered plans; and (3) the health care plans have an increase in a percentage cost-sharing requirement measured from March 23, 2010. *See* 42 U.S.C. § 18011(a) (2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. §147.140.  Plaintiffs have never been informed or received notice that their plans were grandfathered.

97.   Due to the Mandate, Plaintiff Legatus will no longer be allowed to exclude contraception, abortion, and abortifacients from their insurance plans— and will be forced to facilitate access to and provide for these services which violate its religious beliefs.

98.   Due to the Mandate, Plaintiff Daniel Weingartz and Plaintiff Weingartz Supply Company will no longer be allowed to exclude contraception, abortion, and abortifacients from their insurance plans—and will be forced to facilitate access to, provide, and pay for these services which violate their religious beliefs.

99.   Plaintiffs wish to conduct their business in a manner that does not violate the principles of their religious faith.

100. Plaintiff Legatus additionally seeks for the members of Legatus to be able to conduct their respective businesses in a manner that does not violate the principles of the religious faith of its over 4,000 members.

101. Complying with the Mandate requires a direct violation of the Plaintiffs' religious beliefs because it requires Plaintiffs to pay for or assist others in obtaining not only contraception, but also abortion, because certain drugs and devices such as the "morning-after pill," "Plan B," and "ella" come within the Mandate's and Health Resources and Services Administration's definition of

23

"Food and Drug Administration-approved contraceptive methods" despite their known abortifacient mechanisms of action.

102. Defendants' refusal to accommodate the conscience of the Plaintiffs, and of other Americans who share the Plaintiffs' religious views, is highly selective.  Numerous exemptions exist in the Affordable Care Act which appear arbitrary and were granted to employers who purchase group insurance.  This evidences that Defendants do not mandate that all insurance plans need to cover "preventive services" (e.g. the thousands of waivers from the Affordable Care Act issued by Defendants for group insurance based upon the commercial convenience of large corporations, the age of the insurance plan, or the size of the employer). *See, e.g.,* 45 C.F.R. § 147.126(d)(3).

103. Congress and their Congressional staff will likely be waived from compliance with the Affordable Care Act, and therefore the Mandate.  78 Fed. Reg. 48,337 (Aug. 8, 2013).

104. Despite granting waivers upon a seemingly arbitrary basis, no exemption exists for an employer or individual whose religious conscience instructs him that certain mandated services are unethical, immoral, and volatile to one's religious beliefs.  Defendants' plan fails to give the same level of weight or accommodation to the exercise of one's fundamental First Amendment freedoms that it assigns to the yearly earnings of a corporation.

105.   The Defendants' actions violate Plaintiffs' right to freedom of religion, as secured by the First Amendment to the United States Constitution and civil rights statutes, including the Religious Freedom Restoration Act (RFRA).

106.   The Defendants' actions also violate Plaintiffs' right to the freedom of speech, as secured by the First Amendment to the United States Constitution.

107.   Furthermore, the Mandate is also illegal because it was imposed by Defendants without prior notice or sufficient time for public comment, and otherwise violates the Administrative Procedure Act, 5 U.S.C. § 553.

108.   Had Plaintiffs' religious beliefs or the beliefs of the million other Americans who share Plaintiffs' religious beliefs been obscure or unknown, the Defendants' actions might have been an accident.   But because the Defendants acted with full knowledge of those beliefs, and because they arbitrarily exempt some plans for a wide range of reasons other than religious conviction, the Mandate can be interpreted as nothing other than a deliberate attack by the Defendants on the Catholic Church, the religious beliefs held by Plaintiffs and the similar religious beliefs held by millions of other Americans.   The Defendants have, in sum, intentionally used government power to force individuals to facilitate access to, believe in, support, and endorse the mandated services manifestly contrary to their own religious convictions, and then to act on that coerced belief,

support, or endorsement.  Plaintiffs seek declaratory and injunctive relief to protect against this attack.

**The Affordable Care Act**

109.  In March 2010, Congress passed, and President Obama signed into law, the "Patient Protection and Affordable Care Act" (Pub. L. 111-148, March 23, 2010, 124 Stat. 119) and the "Health Care and Education Reconciliation Act" (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (referred to in this complaint as the "Affordable Care Act").

110.  The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

111.  The Affordable Care Act does not apply equally to all insurers.

112.  The Affordable Care Act does not apply equally to all individuals.

113.  Plaintiff Weingartz Supply Company and its subsidiaries constitute a "single employer" for purposes of the Affordable Care Act as defined at 42 U.S.C. § 18024(b)(4)(A).

114.  Plaintiff Legatus constitutes a "single employer" for purposes of the Affordable Care Act as defined at 42 U.S.C. § 18024(b)(4)(A).

115.  Plaintiffs must provide federal government-approved health insurance under the Affordable Care Act or pay substantial per-employee fines.

116.   The Affordable Care Act applies different fines and penalties to employers with fewer than 50 employees. An employer with fewer than 50 employees may drop insurance all together without incurring a fine.  26 U.S.C. § 4980H(c)(2)(A).  However, if an employer with fewer than 50 employees supplies insurance, then it must comport with the Affordable Care Act and the Mandate or be subject to a $100 per day, per employee fine each year.  26 U.S.C. § 4980D(a).

117.   Employers with more than 50 employees are subject to two fines for noncompliance with the Affordable Care Act and the Mandate.  26 U.S.C. § 4980H ($2,000 per employee annually); 26 U.S.C. § 4980D(a) ($100 per day, per employee annually).

118.   Certain provisions of the Affordable Care Act do not apply equally to members of certain religious groups. *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(B)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

119.   Plaintiffs do not qualify for an individual exemption under 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) as Plaintiffs do not object to acceptance of public or private insurance funds in their totality and currently enjoy health insurance benefits that exclude contraceptives, abortion, and abortifacients.

120.   The Affordable Care Act's preventive care requirements do not apply to employers who provide so-called "grandfathered" health care plans.

121.   Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

122.   Plaintiffs' current insurance plans do not qualify as "grandfathered" health care plans, and are considered "non-grandfathered."

123.   Furthermore, Plaintiffs do not qualify for the "religious employer" exemption contained in 45 CFR § 147.130 (a)(1)(A) and (B).

124.   Plaintiffs are thus subjected to the Mandate now and are confronted with choosing between complying with its requirements in violation of their religious beliefs or violating federal law.

125.   Plaintiffs must choose between complying with the requirements of the Affordable Care Act in violation of their religious beliefs or either paying ruinous fines that would have a crippling impact on their ability to survive economically.

126.   Plaintiffs are confronted with complying with the requirements of the Affordable Care Act in violation of their religious beliefs or removing themselves from the health insurance market in its entirety—endangering the health and economic stability of their families and forcing Plaintiffs to be non-competitive as employers in a market where other, non-Catholic employers will be able to provide

insurance to their employees under the Affordable Care Act without violating their religious beliefs.

127.   The Affordable Care Act is not generally applicable because it provides for numerous exemptions from its rules.

128.   The Affordable Care Act is not neutral because some groups, both secular and religious, enjoy exemptions from the law, while certain religious groups do not.   Some groups, both secular and religious, have received waivers from complying with the provisions of the Affordable Care Act, while others— such as the Plaintiffs—have not.

129.   The Affordable Care Act creates a system of individualized exemptions.

130.   The United States Department of Health and Human Services has the authority under the Affordable Care Act to grant compliance waivers ("HHS waivers") to employers and other health insurance plan issuers.

131.   HHS waivers release employers and other plan issuers from complying with the provisions of the Affordable Care Act.

132.   HHS decides whether to grant waivers based on individualized waiver requests from particular employers and other health insurance plan issuers.

133.   Upon information and belief, more than a thousand HHS waivers have been granted.

## The "Preventive Care" Mandate

134.   A provision of the Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directs the Secretary of United States Department of Health and Human Services to determine what would constitute "preventive care" under the mandate.  42 U.S.C § 300gg–13(a)(4).

135.   Defendants promulgated a mandate that group health plans include coverage for all Food and Drug Administration-approved contraceptive methods and procedures, patient education, and counseling for all women with reproductive capacity in plan years beginning on or after August 1, 2012 (hereafter, "the Mandate").  *See* 45 CFR § 147.130 (a)(1)(iv), as confirmed at 77 Fed. Register 8725 (Feb. 15, 2012), adopting and quoting Health Resources and Services Administration (HRSA) Guidelines, (http://www.hrsa.gov/womensguidelines).

136.   The Mandate was enacted pursuant to statutory authority under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, as amended by the Health Care and Education Act of 2010, Pub. L. No. 111-152 (ACA). 77 Fed. Reg. 31, 8725 ("Affordable Care Act").

137.   In its ruling, HHS included all FDA-approved contraceptives under the banner of preventive services, including contraception, abortion, and abortifacients such as the "morning-after pill," "Plan B," and "ella," a close cousin of the abortion pill RU-486.  (http://www.hrsa.gov/womensguidelines).

138.   The Mandate's reach seeks to control the decisions of employers, individuals and also the decisions of *all* insurance issuers (i.e. "Blue Cross/Blue Shield of Michigan," etc.).  42 USC § 300gg-13 (a)(1),(4). ("A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force; . . . with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.").

139. Group insurance plans and insurance issuers were mandated to include contraception, abortion, and abortifacients such as the "morning-after pill," "Plan B," and "ella" in *all* of its group *and* individual plans, not specifically exempted, beginning as of August 1, 2012.

140.   Individuals and employers, regardless of the number of employees they employ, will eventually be forced to select an insurance plan which includes what HHS deemed "preventive care."

141.   All individuals and employers will be stripped of their choice not to pay for the "preventive care," regardless of whether paying for such "services" violates one's conscience or deeply held religious beliefs.

142.   Health insurance issuers include insurance companies such as Blue Cross/Blue Shield of Michigan, which is the insurance issuer used by Plaintiff Legatus and also third party administrator used by Plaintiffs Weingartz Supply Company and Daniel Weingartz.

143.   The Mandate reaches even further than the Affordable Care Act to eliminate all employers and individuals from selecting a health insurance plan in which the insurance issuers do not automatically provide contraception, abortion, and abortifacients.

144.   Prior to promulgating the Mandate, Defendants accepted public comments to the 2010 interim final regulations from July 19, 2010 to September 17, 2010. Upon information and belief, a large number of groups filed comments, warning of the potential conscience implications of requiring religious individuals and groups to pay for certain kinds of services, including contraception, abortion, and abortifacients.

145.   On July 19, 2010, Defendants published an interim final rule (the Mandate) under the Affordable Care Act.  75 Fed. Reg. 41726 (2010).  The interim final rule required providers of group health insurance to cover preventive care for women as provided in guidelines to be published by the Health Resources and Services Administration at a later date.  75 Fed. Reg. 41759 (2010).

146.   The July 19, 2010 interim final rule was enacted without prior notice of rulemaking or opportunity for public comment, because Defendants determined for themselves that "it would be impracticable and contrary to the public interest to delay putting the provisions . . . in place until a full public notice and comment process was completed." 75 Fed. Reg. at 41730.

147.   Although Defendants suggested in the Interim Final Rule that they would solicit public comments after implementation, they stressed that "provisions of the Affordable Care Act protect significant rights" and therefore it was expedient that "participants, beneficiaries, insureds, plan sponsors, and issuers have certainty about their rights and responsibilities." *Id.*

148.   Defendants stated they would later "provide the public with an opportunity for comment, but without delaying the effective date of the regulations," demonstrating their intent to impose the regulations regardless of the legal flaws or general opposition that might be manifest in public comments. *Id.*

149.   In addition to reiterating the Affordable Care Act's preventive services coverage requirements, the Interim Final Rule provided further guidance concerning the Act's restriction on cost sharing.

150.   The Interim Final Rule makes clear that "cost sharing" refers to "out-of-pocket" expenses for plan participants and beneficiaries. 75 Fed. Reg. at 41730.

151.   The Interim Final Rule acknowledges that, without cost sharing, expenses "previously paid out-of-pocket" would "now be covered by group health plans and issuers" and that those expenses would, in turn, result in "higher average premiums for all enrollees." *Id.*; *see also id.* at 41737 ("Such a transfer of costs could be expected to lead to an increase in premiums."). In other words, the prohibition on cost-sharing was simply a way "to distribute the cost of preventive services more equitably across the broad insured population." 75 Fed. Reg. at 41730.

152.   After the Interim Final Rule was issued, numerous commenters warned against the potential conscience implications of requiring religious individuals and organizations to include certain kinds of services—specifically contraception, sterilization, and abortion services—in their health care plans.

153.   Defendants directed a private health policy organization, the Institute of Medicine (IOM), to make recommendations regarding which drugs, procedures, and services all health plans should cover as preventive care for women.

154.   In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans. These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum.

155.   No religious groups or other groups that opposed government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

156.   On July 19, 2011, the IOM published its preventive care guidelines for women, including a recommendation that preventive services include "[a]ll Food and Drug Administration approved contraceptive methods [and] sterilization procedures." Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps, at 102-10 and Recommendation 5.5 (July 19, 2011).

157.   FDA-approved contraceptive methods include contraception, abortifacients, birth-control pills, contraceptive devices such as IUDs,  Plan B (also known as the "morning-after pill"), ulipristal (also known as "ella" or the "week-after pill"), and other drugs, devices, and procedures.

158.   Some of these drugs and devices—including the "emergency contraceptives" Plan B and ella and certain IUDs—are known abortifacients, in

that they can cause the death of an embryo by preventing it from implanting in the wall of the uterus.

159.   Indeed, the FDA's own Birth Control Guide states that both Plan B and ella can work by "preventing attachment (implantation) to the womb (uterus)." FDA, Office of Women's Health, Birth Control Guide at 16-17, available at (http://www.fda.gov/ForConsumers/ByAudience/ForWomen/ucm118465.htm, last visited Aug. 29, 2013).

160.   On August 1, 2011, thirteen days after IOM issued its recommendations, HRSA issued guidelines adopting them in full. (http://www.hrsa.gov/womensguidelines, last visited Aug. 29, 2013).

**The "Religious Employers" Exemption**

161.   That same day, Defendants promulgated an additional Interim Final Rule. 76 Fed. Reg. 46621 (Aug. 3, 2011).

162.   This Second Interim Final Rule granted HRSA "discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned." 76 Fed. Reg. 46621, 46623.

163.   The term "religious employer" was restrictively defined as one that (1) has as its purpose the "inculcation of religious values"; (2) "primarily employs persons who share the religious tenets of the organization"; (3) "serves primarily persons who share the religious tenets of the organization"; and (4) "is a nonprofit

organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. at 46626.

164.   The fourth of these requirements refers to "churches, their integrated auxiliaries, and conventions or associations of churches" and the "exclusively religious activities of any religious order." 26 U.S.C.A. § 6033.

165.   Thus, the "religious employers" exemption was severely limited to formal churches, their integrated auxiliaries, and religious orders whose purpose is to inculcate faith and that hire and serve primarily people of their own faith tradition.

166.   HRSA exercised its discretion to grant an exemption for religious employers via a footnote on its website listing the Women's Preventive Services Guidelines.  The footnote states that "guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers." (http://www.hrsa.gov/womensguidelines, last visited Aug. 29, 2013).

167.   Although religious organizations share the same religious beliefs and concerns as objecting churches, their integrated auxiliaries, and objecting religious orders, Defendants deliberately ignored the regulation's impact on their religious liberty, stating that the exemption sought only "to provide for a religious

accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. 46621, 46623.

168.   Thus, the vast majority of religious organizations with conscientious objections to providing contraceptive or abortifacient services were excluded from the "religious employers" exemption.

169.   Like the original Interim Final Rule, the Second Interim Final Rule was made effective immediately, without prior notice or opportunity for public comment.

170.   Defendants acknowledged that "while a general notice of proposed rulemaking and an opportunity for public comment is generally required before promulgation of regulations," they had "good cause" to conclude that public comment was "impracticable, unnecessary, or contrary to the public interest" in this instance. 76 Fed. Reg. at 46624.

171.   Upon information and belief, after the Second Interim Final Rule was put into effect, over 100,000 comments were submitted opposing the narrow scope of the "religious employers" exemption and protesting the contraception mandate's gross infringement on the rights of religious individuals and organizations.

172.   Defendants did not take into account the concerns of religious organizations in the comments submitted before the Second Interim Rule was issued.

173.   Instead the Second Interim Rule was unresponsive to the concerns, including claims of statutory and constitutional conscience rights, stated in the comments submitted by religious organizations.

**The Safe Harbor**

174.   The public outcry for a broader religious employers exemption continued for many months, and on January 20, 2013, Defendants issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with the new law." (http://www.hhs.gov/news/press/2012pres/01/20120120a.html, last visited Aug. 29, 2013).

175.   On February 10, 2012, Defendants formally announced a "safe harbor" for non-exempt nonprofit religious organizations that objected to covering free contraceptive and abortifacient services.

176.   There was no "safe harbor" for for-profit companies or owners, such as Plaintiffs Daniel Weingartz or Weingartz Supply Company.

177.   Under the safe harbor, Defendants agreed it would not take any enforcement action against an eligible organization during the safe harbor, which would remain in effect until the first plan year beginning after August 1, 2013.

178.   Defendants also indicated it would develop and propose changes to the regulations to accommodate the objections of non-exempt, nonprofit religious organizations following August 1, 2013.

179.   Despite the safe harbor and Defendants' accompanying promises, on February 15, 2012, Defendants published a final rule "finalizing, without change," the contraception and abortifacient mandate and narrow religious employers exemption. 77 Fed. Reg. 8725-01 (Feb. 15, 2012).

**Advance Notice of Proposed Rulemaking**

180.   On March 21, 2012, Defendants issued an Advance Notice of Proposed Rulemaking (ANPRM), presenting "questions and ideas" to "help shape" a discussion of how to "maintain the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations.  77 Fed. Reg. 16501, 16503 (2012).

181.   The ANPRM conceded that forcing religious organizations to "contract, *arrange*, or pay for" the objectionable contraceptive and abortifacient servicers would infringe their "religious liberty interests." *Id*. (emphasis added).

182.   In vague terms, the ANPRM proposed that the "health insurance issuers" for objecting religious employers could be required to "assume the responsibility for the provision of contraceptive coverage without cost sharing." *Id*.

183.   For the first time, and contrary to the earlier definition of "cost sharing," Defendants suggested in the ANPRM that insurers and third party administrators could be prohibited from passing along their costs to the objecting religious organizations via increased premiums. *See id.*

184.   "[A]pproximately 200,000 comments" were submitted in response to the ANPRM, 78 Fed. Reg. 8456, 8459, largely reiterating previous comments that the ANPRM's proposals would not resolve conscientious objections, because the objecting religious organizations, by providing a health care plan in the first instance, would still be coerced to arrange for and facilitate access to abortifacient services.

**Notice of Proposed Rulemaking**

185.   On February 1, 2013, Defendants issued a Notice of Proposed Rulemaking (NPRM) purportedly addressing the comments submitted in response to the ANPRM. 78 Fed. Reg. 8456 (Feb. 6, 2013).

186.   The NPRM proposed two changes to the then-existing regulations.  78 Fed. Reg. 8456, 8458-59.

187.   First, it proposed revising the religious employers' exemption by eliminating the requirements that religious employers have the purpose of inculcating religious values and primarily employ and serve only persons of their same faith. 78 Fed. Reg. at 8461.   Under this proposal a "religious employer"

41

would be one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 8461.

188.   Defendants emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules." 78 Fed. Reg. 8456, 8461.

189.   In other words, religious organizations that are not formal churches or religious orders would continue to be excluded from the exemption.

190.   Second, the NPRM reiterated HHS's intention to "accommodate" non-exempt, nonprofit religious organizations by making them "designate" their insurers and third party administrators to provide plan participants and beneficiaries with free access to contraceptive and abortifacient drugs and services.

191.   The proposed "accommodation" did not resolve the concerns of religious organizations, such as Plaintiff Legatus, because it continued to force them to deliberately provide health insurance that would directly trigger access to abortion-inducing drugs and related education and counseling.

192.   In issuing the NPRM, HHS requested comments from the public by April 8, 2013. 78 Fed. Reg. 8457.

193.   "[O]ver 400,000 comments" were submitted in response to the NPRM, 78 Fed. Reg. 39870, 39871, with religious organizations again

42

overwhelmingly decrying the proposed accommodation as a gross violation of their religious liberty because it would conscript their health care plans as the main component in the government's scheme for expanding access to contraceptive and abortifacient services.

194.   On April 8, 2013, the same day the notice-and-comment period ended, Defendant Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.  In her remarks, Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception. Churches and church dioceses as employers are exempted from this benefit. But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage* to their employees starting August 1st. . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included* in the benefit package.

*See* The Forum at Harvard School of Public Health, A Conversation with Kathleen Sebelius, U.S. Secretary of Health and Human Services, Apr. 8, 2013, *available at* (http://theforum.sph.harvard.edu/events/conversation-kethleen-sebelius, last visited Aug. 29, 2013) (Episode 9 at 2:25) (emphases added).

195.   From the timing of these remarks, it seems that Defendants gave no consideration to the comments submitted in response to the NPRM's proposed "accommodation."

**The Final Mandate**

196.   On June 28, 2013, Defendants issued a final rule (the "Final Mandate"), which ignores the objections repeatedly raised by religious organizations and continues to co-opt objecting religious employers into the government's scheme of expanding free access to contraceptive and abortifacient services. 78 Fed. Reg. 39870.

197.   Under the Final Mandate, the discretionary "religious employers" exemption, which is still implemented via footnote on the HRSA website, (http://www.hrsa.gov/womensguidelines, last visited Aug. 29, 2013), remains limited to formal churches and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39874.

198.   All other religious organizations, including Plaintiff Legatus, are excluded from the exemption.

199.   The Final Mandate creates a separate "accommodation" for certain non-exempt religious organizations. 78 Fed. Reg. at 39874.

200.   An organization is eligible for the accommodation if it (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious

organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874.

201.   The self-certification must be executed "prior to the beginning of the first plan year to which an accommodation is to apply." 78 Fed. Reg. at 39875.

202.   The Final Rule extends the current safe harbor through the end of 2013. 78 Fed. Reg. at 39889.

203.   Thus, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014, and deliver it to the organization's insurer or, if the organization has a self-insured plan, to the plan's third party administrator. 78 Fed. Reg. at 39875.

204.   By the terms of the accommodation, Plaintiff Legatus will be required to execute the self-certification and deliver it to its insurance issuer before January 1, 2014.

205.   By delivering its self-certification to its insurer administrator, Plaintiff Legatus would directly trigger the insurer's obligation to make "separate payments for contraceptive services for Plaintiff Legatus' plan participants and beneficiaries." 78 Fed. Reg. at 39875-76.

206.   Plaintiff Legatus would have to identify its employees to their insurer, Blue Cross/ Blue Shield of Michigan for the distinct purpose of enabling the

government's scheme to facilitate free access to contraceptive and abortifacient services.

207.  The insurer's obligation to make direct payments for contraceptive and abortion services would continue only "for so long as the participant or beneficiary remains enrolled in the plan." 78 Fed. Reg. at 39876.

208.  Thus Plaintiff Legatus would have to coordinate with its insurer and regarding when it was adding or removing employees and beneficiaries from its healthcare plan and, as a result, from the contraceptive and abortifacient services payment scheme.

209.  Insurers would be required to notify plan participants and beneficiaries of the contraceptive payment benefit "contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment" in a group health plan. 78 Fed. Reg. at 39876.

210.  This would also require Plaintiff Legatus to coordinate the notices with its insurer.

211.  The insurer would be required to provide the contraceptive benefits "in a manner consistent" with the provision of other covered services. 78 Fed. Reg. at 39876-77.

212.  Thus, any payment or coverage disputes presumably would be resolved under the terms of Plaintiff Legatus' existing plan documents.

46

213.   Thus, even under the accommodation, Plaintiff Legatus and every other non-exempt objecting religious organization would continue to play a central role in facilitating free access to contraceptive and abortifacient services.

214.   Under the accommodation, issuers "may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), *or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly*, on the eligible organization." 78 Fed. Reg. at 39896 (emphasis added).

215.   For all other preventive services, including non-contraceptive preventive services for women, only cost-sharing (*i.e.*, out-of-pocket expense) is prohibited. There is no restriction on passing along costs via premiums or other charges.

216.   Defendants state that they "continue to believe, and have evidence to support," that providing payments for contraceptive and abortifacient services will be "cost neutral for issuers," because "[s]everal studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health." 78 Fed. Reg. at 39877.

217.   On information and belief, the studies Defendants rely upon to support this claim are severely flawed.

218.    Nevertheless, even if the payments were—over time—to become cost neutral, it is undisputed that there will be up-front costs for making the payments. *See, e.g.,* 78 Fed. Reg. at 39877-78 (addressing ways insurers can cover up-front costs).

219.   Moreover, if cost savings arise that make insuring an employer's employees cheaper, the savings would have to be passed on to employers through reduced premiums, not retained by insurance issuers.

220.   Defendants suggest that, to maintain cost neutrality, issuers may simply ignore this fact and "set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants." 78 Fed. Reg. at 39877.

221.   This encourages issuers to artificially inflate the eligible organization's premiums.

222.   Even assuming the legality of the "accommodation," the eligible organization would still bear the cost of the required payments for contraceptive and abortifacient services in violation of its conscience, as if the accommodation had never been made.

223.   Defendants have suggested that "[a]nother option" would be to "treat the cost of payments for contraceptive services . . . as an administrative cost that is

spread across the issuer's entire risk pool, excluding plans established or maintained by eligible organizations." 78 Fed. Reg. at 39878.

224.   There is no legal authority for forcing third parties to pay for services provided to eligible organizations under the accommodation.

225.   Furthermore, under the Affordable Care Act, Defendants lack authority in the first place to coerce insurers to directly purchase contraceptive and abortifacient services for an eligible organization's plan participants and beneficiaries.

226.   Thus, the accommodation fails to protect objecting religious organizations for lack of statutory authority.

227.    For all these reasons, the accommodation does nothing to relieve non-exempt religious organizations with insured plans from being co-opted as the central component in the government's scheme to expand access to free contraceptive and abortifacient services.

228.   Plaintiff Legatus' religious beliefs preclude it from soliciting, contracting with, or designating a third party to provide religiously objectionable drug, devices, or services.

229.   There is no way to ensure that the cost of administering the contraceptive and abortifacient services would not be passed on to Plaintiff Legatus through the insurer's fees.

230.   Moreover, taking the user fees intended for funding the federal exchanges and using them to provide contraceptive and abortifacient services to employees not participating in the federal exchanges would violate the statute authorizing the user fees. *See* 78 Fed. Reg. at 15412; 31 U.S.C. § 9701.

231.   The "accommodation" is nothing more than a shell game that attempts to disguise the religious organization's role as the central component in the government's scheme for expanding access to contraceptive and abortifacient services.

232.    Despite the accommodation's convoluted machinations, a religious organization's decision to offer health insurance and its self-certification continue to serve as the sole triggers for creating access to free contraceptive and abortifacient services.

233.   Plaintiff Legatus cannot participate in or facilitate the government's scheme in this manner without violating its religious convictions.

234.   Defendants have made absolutely no attempt to accommodate or exempt for-profit companies or its individual owners, such as Plaintiffs Weingartz Supply Company of Daniel Weingartz

235.   It is inevitable with the current state of the law that Plaintiffs will have to comply with the Mandate, despite the fact that Plaintiffs will violate the teachings of their religious beliefs and the teachings of their Catholic faith by

directly facilitating access to, providing, funding, and/or allowing the disseminating information and guidance about where to obtain contraception, abortion, or abortifacient services.

236.   Plaintiffs plan years begin on January 1.

237.   Without a preliminary or permanent injunction from the Court or a Declaratory Judgment halting the mandate, Plaintiffs must choose between violating federal law and incurring penalties, dropping group health insurance altogether for their employees, or violating their sincerely held religious beliefs.

**Mandate is Not Narrowly Tailored to Meet a Compelling Governmental Interest**

238.   The government lacks any compelling interest in coercing Plaintiffs to facilitate access to or provide contraceptive or abortifacient services.

239.   The required contraceptives and abortifacient drugs, devices, and related services are already widely available at non-prohibitive costs at health centers and pharmacies nationally, even without a prescription.

240.   There are multiple ways in which the government could provide access without forcing employers with religious objections to act in violation of their religious beliefs.

241.   For example, it could pay for the objectionable services through its existing network of family planning services funded under Title X, through direct

government payments, the government's exchanges or websites, or through tax deductions, refunds, or credits.

242.   The government could also simply exempt all religious organizations and employers who object in accordance with their religious beliefs, just as it has already exempted nonprofit religious employers referred to in Section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.

243.   Defendants claim that its "religious employers" exemption does not undermine its compelling interest in making contraceptive and abortifacient services available for free to women because "houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people who are of the same faith and/or adhere to the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39887.

244.   In one form or another, the government also provides exemptions for grandfathered plans, 42 U.S.C. § 18011; 75 Fed. Reg. 41,726, 41,731 (2010), and certain religious denominations, 26 U.S.C. § 5000A(d)(2)(a)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26

U.S.C. § 5000A(d)(2)(b)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

245.   These broad exemptions further demonstrate that the government has no compelling interest in refusing to include employer with religious objections, such as Plaintiffs, within its religious employers exemption.

246.   Employers who follow Defendants' guidelines may continue to use grandfathered plans indefinitely.

247.   Indeed, Defendants have predicted that a majority of large employers, employing more than 50 million Americans, will continue to use grandfathered plans through at least 2014, and that a third of medium-sized employers with between 50 and 100 employees may do likewise. 75 Fed. Reg. 34538 (June 17, 2010); (http://www.healthcare.gov/news/ factsheets/2010/06/keeping-the-health planyou-have-grandfathered.html, last visited Aug. 29, 2013) (noting that amendment to regulations "will result in a small increase in the number of plans retaining their grandfathered status relative to the estimates made in the grandfathering regulation").

248.   The government's recent decision to postpone the employer mandate—i.e., the annual fine of $2000 per employee for not offering any insurance—also demonstrates that there is no compelling interest in coercing universal compliance with the Final Mandate concerning contraceptive and

abortifacient services, since employers can now drop their insurance entirely without any penalty, at least for one additional year.

249.   These broad exemptions also demonstrate that the Final Mandate is not a generally applicable law entitled to judicial deference, but rather is constitutionally flawed.

250.   The government's willingness to exempt various secular organizations and postpone the employer mandate, while adamantly refusing to provide anything but the narrowest of exemptions for religious organizations or employers with religious objections also shows that the Final Mandate is not neutral, but rather discriminates against employers with religious objections because of their religious commitment to promoting the sanctity of life.

251.   Indeed, the Final Mandate was promulgated by government officials, and supported by non-governmental organizations, who strongly oppose religious teachings and beliefs regarding marriage and family.

252.   Defendant Sebelius, for example, has long been a staunch supporter of abortion rights and a vocal critic of religious teachings and beliefs regarding abortion and contraception.

253.   On October 5, 2011, six days after the comment period for the original interim final rule ended, Defendant Sebelius gave a speech at a fundraiser for

NARAL Pro-Choice America. She told the assembled crowd that "we are in a war."

254.   She further criticized individuals and entities whose beliefs differed from those held by her and the others at the fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services?   Not so much."

255.   On July 16, 2013, Secretary Sebelius further compared opponents of the Affordable Care Act generally to "people who opposed civil rights legislation in the 1960s," stating that upholding the Act requires the same action as was shown "in the fight against lynching and the fight for desegregation." (http://www.hhs.gov/secretary/about/speeches/sp20130716.html, last visited Aug. 7, 2013).

256.   Consequently, on information and belief, Plaintiffs alleges that the purpose of the Final Mandate, including the restrictively narrow scope of the religious employers' exemption, is to discriminate against employers who hold religious beliefs that oppose contraception and abortion.

## CLAIMS

### COUNT I
**Violation of the First Amendment to the United States Constitution
Free Exercise Clause**

257.   Plaintiffs incorporate by reference all preceding paragraphs.

258.   Plaintiffs' sincerely held religious beliefs prohibit it from providing coverage for contraception, abortion, or related education and counseling. Plaintiffs' compliance with these beliefs is a religious exercise.

259.   Neither the Affordable Care Act nor the Mandate is neutral.

260.   Neither the Affordable Care Act nor the Mandate is generally applicable.

261.   Defendants have created categorical exemptions and individualized exemptions to the Mandate.

262.   The Mandate furthers no compelling governmental interest.

263.   The Mandate is not the least restrictive means of furthering Defendants' stated interests.

264.   The Mandate creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

265.   The Mandate chills Plaintiffs' religious exercise.

266.   The Mandate exposes Plaintiffs to substantial competitive disadvantages, in that it will no longer be permitted to offer health insurance.

267.   The Mandate exposes Plaintiffs to substantial fines for their religious exercise.

268.   The Mandate exposes Plaintiffs to monetary and health risks as they will no longer be able to accept health insurance, nor be able to purchase or provide health care insurance without violating their religious beliefs.

269.   The Mandate imposes a substantial burden on Plaintiffs' religious exercise.

270.   The Mandate is not narrowly tailored to any compelling governmental interest.

271.   The Mandate and Defendants' threatened enforcement of the Mandate violate Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.

272.   Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

### COUNT II
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

273.   Plaintiffs incorporate by reference all preceding paragraphs.

274.   Plaintiffs' sincerely held religious beliefs prohibit them from facilitating access to, purchasing, or providing coverage for contraception,

abortion, or related education and counseling.  Plaintiffs' compliance with these beliefs is a religious exercise.

275.   Despite being informed in detail of these beliefs beforehand, Defendants designed the Mandate and the religious exemption to the Mandate in a way that made it impossible for Plaintiffs to comply with their religious beliefs.

276.   Defendants promulgated both the Mandate and the religious exemption to the Mandate in order to suppress the religious exercise of Plaintiffs and others.

277.   The Mandate and Defendants' threatened enforcement of the Mandate thus violate Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

278.   Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

### COUNT III
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause

279.   Plaintiffs incorporate by reference all preceding paragraphs.

280.   By design, Defendants imposed the Mandate on some religious organizations or religious individuals but not on others, resulting in discrimination among religions.

281.   The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

282.   The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no religious individuals.

283.   The Mandate and Defendants' threatened enforcement of the Mandate thus violate Plaintiffs' rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

284.   Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT IV
### Violation of the First Amendment to the United States Constitution Establishment Clause

285.   Plaintiffs incorporate by reference all preceding paragraphs.

286.   By design, defendants imposed the Mandate on some religious organizations but not on others, resulting in a selective burden on Plaintiffs.

287.   Defendants also imposed the Mandate on some religious individuals and religious organizations but not on others, resulting in a selective burden on Plaintiffs.

288. The Mandate vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no organizations meeting the definition of "religious employers."

289. The Mandate also vests HRSA with unbridled discretion in deciding whether to allow exemptions to some, all, or no individuals.

290. The Mandate and Defendants' threatened enforcement of the Mandate therefore violates Plaintiffs' rights secured to it by the Establishment Clause of the First Amendment to the United States Constitution.

291. Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT V
## Violation of the First Amendment to the United States Constitution
## Freedom of Speech

292. Plaintiffs incorporate by reference all preceding paragraphs.

293. Plaintiffs profess, educate, lecture, give presentations, and engage in outreach amongst Legatus members and in their community that contraception, abortion, and abortifacients violate their religious beliefs.

294. The Mandate would compel Plaintiffs to provide or subsidize activities that Plaintiffs profess, educate, lecture, give presentations, and engage in outreach amongst over 4,000 members of Legatus and in their community are violations of the Plaintiffs' religious beliefs.

60

295.  The Mandate would compel Plaintiffs to fund and to provide education and counseling related to contraception, abortion, and abortifacients.

296.  Defendants' actions thus violate Plaintiffs' right to be free from compelled speech as secured to it by the First Amendment of the United States Constitution.

297.  The Mandate's compelled speech requirement is not narrowly tailored to a compelling governmental interest.

298.  Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VI
### Violation of the First Amendment to the United States Constitution
### Expressive Association

299.  Plaintiffs incorporate by reference all preceding paragraphs.

300.  Plaintiffs profess, educate, lecture, give presentations, and engage in outreach amongst the over 4,000 members of Legatus and in their community that contraception, abortion, and abortifacients violate their religious beliefs.

301.  The Mandate would compel Plaintiffs to subsidize activities that Plaintiffs profess, educate, lecture, give presentations, and engage in outreach amongst the over 4,000 members of Legatus and in their community are violations of Plaintiffs' religious beliefs.

302.   The Mandate would compel Plaintiffs to facilitate access to, to fund, and to provide education and counseling related to contraception, abortion, and abortifacients.

303.   Defendants' actions thus violate Plaintiffs' right of expressive association as secured to it by the First Amendment of the United States Constitution.

304.   Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VII
### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause and Freedom of Speech

305.   Plaintiffs incorporate by reference all preceding paragraphs.

306.   By stating that HRSA "may" grant an exemption to certain religious groups, the Mandate vests HRSA with unbridled discretion over which organizations or individuals can have its First Amendment interests accommodated.

307.   The Mandate vests HRSA with unbridled discretion to determine whether a religious individual or organization such as Plaintiffs fall under a religious exemption.

308.   The Mandate furthermore seems to have completely failed to address the constitutional and statutory implications of the Mandate on for-profit, secular

employers such as Plaintiff Weingartz Supply Company and Plaintiff Daniel Weingartz.  As such, Plaintiff Weingartz Supply Company and Plaintiff Daniel Weingartz are subject to the unbridled discretion of HRSA to determine whether such companies would be exempt.

309.   Defendants' actions therefore violate Plaintiffs' right not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to it by the First Amendment of the United States Constitution.

310.   Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT VIII
## Violation of the Religious Freedom Restoration Act

311.   Plaintiffs incorporate by reference all preceding paragraphs.

312.   Plaintiffs' sincerely held religious beliefs prohibit it from facilitating access to, providing, or purchasing coverage for contraception, abortion, abortifacients, or related education and counseling.  Plaintiffs' compliance with these beliefs is a religious exercise.

313.   The Mandate creates government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

314.   The Mandate chills Plaintiffs' religious exercise.

315. The Mandate exposes Plaintiffs to substantial fines for their religious exercise.

316. The Mandate exposes Plaintiffs to substantial competitive disadvantages, in that it will no longer be permitted to offer or purchase health insurance.

317. The Mandate imposes a substantial burden on Plaintiffs' religious exercise.

318. The Mandate furthers no compelling governmental interest.

319. The Mandate is not narrowly tailored to any compelling governmental interest.

320. The Mandate is not the least restrictive means of furthering Defendants' stated interests.

321. The Mandate and Defendants' threatened enforcement of the Mandate violate Plaintiffs' rights secured to it by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq.

322. Absent injunctive and declaratory relief against the Defendants, Plaintiffs have been and will continue to be harmed.

## COUNT IX
## Violation of the Administrative Procedure Act

323. Plaintiffs incorporate by reference all preceding paragraphs.

324. Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

325. Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented." Defendants did not consider or respond to the voluminous comments they received in opposition to the interim final rule.

326. Therefore, Defendants have taken agency action not in observance with procedures required by law, and Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

327. Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT X
## Violation of the Administrative Procedure Act

328. Plaintiffs incorporate by reference all preceding paragraphs.

329. In promulgating the Mandate, Defendants failed to consider the constitutional and statutory implications of the mandate on Plaintiffs and similar organizations, companies, and individuals.

330. Defendants' explanation for its decision not to exempt Plaintiffs and similar religious organizations and religious individuals from the Mandate runs

65

counter to the evidence submitted by religious organizations during the comment period.

331.   Thus, Defendants' issuance of the interim final rule was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because the rules fail to consider the full extent of their implications and they do not take into consideration the evidence against them.

332.   Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XI
## Violation of the Administrative Procedure Act

333.   Plaintiffs incorporate by reference all preceding paragraphs.

334.   The Mandate is contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (September 30, 2008).

335.   The Weldon Amendment provides that "[n]one of the funds made available in this Act [making appropriations for Defendants United States Department of Labor and United States Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care

entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

336. The Mandate requires issuers, employers, and individuals, including Plaintiffs and Plaintiff Legatus' members to provide and purchase coverage of all Federal Drug Administration-approved contraceptives.

337. Some FDA-approved contraceptives cause abortions.

338. As set forth above, the Mandate violates RFRA and the First Amendment.

339. Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the Administrative Procedure Act.

340. Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## COUNT XII
## Violation of the Administrative Procedure Act

341. Plaintiffs incorporate by reference all preceding paragraphs.

342. The Mandate is contrary to the provisions of the Affordable Care Act.

343. Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title"—i.e., title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

344.    Section 1303 further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

345.    Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; only the issuer does.

346.    However, the Mandate requires all issuers, including Plaintiffs and Plaintiffs' insurance issuer Blue Cross/Blue Shield of Michigan, to provide coverage of all Federal Drug Administration-approved contraceptives.

347.    Some FDA-approved contraceptives cause abortions.

348.    Under 5 U.S.C. § 706(2)(A), the Mandate is contrary to existing law, and is in violation of the Administrative Procedure Act.

349.    Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request that the Court:

a.    Declare that the Mandate and Defendants' enforcement of the Mandate against Plaintiffs violates the First Amendment to the United States Constitution;

b.    Declare that the Mandate and Defendants' enforcement of the Mandate against Plaintiffs violates the Religious Freedom Restoration Act;

c. Declare that the Mandate was issued in violation of the Administrative Procedure Act;

d. Issue both a preliminary and a permanent injunction prohibiting and enjoining Defendants from enforcing the Mandate against Plaintiffs and other religious organizations, religious individuals, employers, and companies that object to funding and providing insurance coverage for contraceptives, abortion, abortifacients, and related education and counseling;

e. Award Plaintiffs the costs of this action and reasonable attorney's fees; and

f. Award such other and further relief as it deems equitable and just.

Respectfully submitted,

THOMAS MORE LAW CENTER

 /s/  Erin Elizabeth Mersino
Erin Elizabeth Mersino, Esq. (P70886)
Richard Thompson, Esq. (P21410)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, Michigan 48106
Tel (734) 827-2001
Fax (734) 930-7160
emersino@thomasmore.org

LAW OFFICE OF CHARLES S. LIMANDRI, APC
Charles S. LiMandri, Esq. (CA Bar No. 110841)
Teresa Mendoza, Esq. (CA Bar No. 185820)
P.O. Box 9120

Rancho Santa Fe, CA 92067
Tel (858) 759-9930
Fax (858) 759-9938
climandri@limandri.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I certify that a copy of the foregoing has been served by ordinary U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically: None

THOMAS MORE LAW CENTER

s/ Erin Mersino_____
Erin Mersino, Esq. (P70886)