**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

LEGATUS, et al.,

      Plaintiffs,

v.                                                                      Case No. 12-12061

KATHLEEN SEBELIUS, et al.,

      Defendants.

_____/

**ORDER AND OPINION GRANTING PLAINTIFF LEGATUS'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Legatus, a non-profit Catholic-faith oriented organization, initially moved for

preliminary injunction on August, 15, 2012, together with Weingartz Supply Company

and Daniel Weingartz, a for-profit business and its owner, under the Religious Freedom

Restoration Act ("RFRA").  On October 31, 2012, the court granted a preliminary

injunction as to Weingatz Supply Company and Weingartz, and denied without

prejudice a preliminary injunction as to Legatus.  While the Government was working to

amend the final regulations, a temporary safe harbor protected Legatus, and the court

held that Legatus therefore did not yet have standing to challenge the contraceptive

coverage requirement of the Patient Protection and Affordable Care Act ("ACA").

Legatus appealed the ruling, and pursuant to a joint motion the proceedings in this court

were stayed pending the appeal.

The Government published the amended final regulations on July 2, 2013.

Legatus voluntarily dismissed its appeal and on August 9, 2013, the court lifted the stay

and reopened the case with respect to Legatus and Defendants.  Once again, Legatus

moves for a preliminary injunction under the RFRA.  Despite being an "eligible

organization," and thereby qualifying for an accommodation under the amended final

rules, Legatus seeks to enjoin the Government from enforcing the provision of the ACA

that requires all group health plans, other than those that are "grandfathered" and

exempt, to provide the full range of FDA-approved contraceptive methods without cost

sharing.  The matter is fully briefed, and no hearing is needed.  *See* E.D. Mich. LR

7.1(f)(2).  For the following reasons, the preliminary injunction will be granted as to

Legatus.

## I.  BACKGROUND

### A.  The Relevant Statutes and Regulations

The ACA requires most businesses to provide insurance coverage, without cost

sharing, for contraceptives, including "preventive care and screenings . . . as provided

for in comprehensive guidelines supported by the Health Resources and Services

Administration ['HRSA']."  42 U.S.C. § 300gg-13(a)(4).  In this context, "without cost

sharing" means free of cost to the patient.  A health plan is considered "grandfathered" if

an individual was enrolled in the plan on March 23, 2010 (the date on which the ACA

was enacted) and the plan remained unchanged after that date.  (AR at 231.)  An

employer with fewer than fifty full-time employees is not required to provide its

employees health care; however, if it chooses to provide health insurance, then it must

provide preventive services coverage, including contraception as described below, or

2

subject itself to a tax of "$100 for each day . . . with respect to each individual to whom

such failure relates."  26 U.S.C. §§ 4980H(a), (c)(2)(A); 26 U.S.C. §§ 4980D(a)[1].

On July 19, 2010, the Government issued interim final regulations implementing

the ACA's preventive services coverage provision.  (AR at 228–29.)  The interim final

regulations require a group health plan or health insurance issuer offering non-

grandfathered health coverage to provide, without cost sharing, the recommended

preventive services ("HRSA Mandate").  (*Id.*)  Plans are required to comply with these

preventive service recommendations starting with the plan year that begins on August

1, 2012.  (*Id.*)

The HRSA enlisted the Institute of Medicine ("IOM"), an independent, non-profit

organization established under the National Academy of Sciences, to develop

preventative service recommendations for the HRSA guidelines.  (AR at 300.)  The IOM

issued a report that recommended the HRSA guidelines include, among other things,

"the full range of Food and Drug Administration ['FDA']-approved contraceptive

methods, sterilization procedures, and patient and education counseling for women with

reproductive capacity."  (AR at 308.)  "FDA-approved contraceptive methods" include

oral contraceptives, emergency contraceptive pills (such as "Plan B" and "Ella"), and

intrauterine devices ("IUDs").  (AR at 403–04.)  On August 1, 2011, the HRSA adopted

the IOM's recommendations in full.  (AR at 264, 283–84.)  On that same date, the

Department of Health and Human Services ("HHS") and the Department of Labor

issued an amendment to the interim final rule that provided HRSA with discretion to

---

[1] The ACA also provides tax incentives for small business to encourage the purchase of health insurance.  *See* 26 U.S.C. § 45R.

3

exempt "religious employers" from covering contraceptive services.  (AR at 220, 264.)

A "religious employer" was defined as an employer that:

> (1) [h]as the inculcation of religious values as its purpose; (2) primarily
> employs persons who share its religious tenets; (3) primarily serves persons
> who share its religious tenets; and (4) is a non-profit organization under
> section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the [Internal
> Revenue] Code.

(AR at 220)  The HRSA subsequently exempted organizations that qualified as religious

employers.  (*Id.*)

On February 15, 2012, after allowing for public comment, the Government

adopted in the final regulations the definition of "religious employer" as described in the

amended interim final regulations.  (AR at 214)  These final regulations also contained

a temporary enforcement safe harbor for non-grandfathered plans that do not qualify for

the "religious employer" exemption.  (*Id.*)  During the temporary safe harbor, the

Government developed and proposed changes to the final regulations for the purpose

of satisfying two goals:  "providing contraceptive coverage without cost-sharing to

individuals who want it and accommodating non-exempted, non-profit organizations'

religious objections to covering contraceptive services."  (*Id.*)  Without the safe harbor,

non-grandfathered, non-exempted plans would be required to comply with the HRSA

Mandate for plan years beginning on or after August 1, 2012.  The safe harbor extended

this date, by one year, to plan years beginning on or after August 1, 2013.  (AR at 272.)

The safe harbor expiration date was subsequently extended further to encompass plan

years beginning on or after August 1, 2013 and before January 1, 2014.  (AR at 265.)

4

On July 2, 2013, the Government issued the amended final regulations that became effective August 1, 2013, and applicable on January 1, 2014. (AR at 2.) The final amended definition of "religious employer" eliminates the first three prongs of the definition and clarifies the fourth in attempt to simplify its meaning. (AR at 6.) Specifically, the changes "were intended to ensure that an otherwise exempt plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer hires or serves people of different religious faiths." (*Id.*) Under the final amended rules, a "religious employer" is "an employer that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code." (*Id.*) Those sections of the code refer to "churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order." (*Id.*) Although the amended final regulations are generally applicable beginning January 1, 2014, the amendments to the "religious employer" exemption apply for plan years beginning on or after August 1, 2013. (AR at 2.)

Separate from the "religious employer" exemption, the amended final rules also "establish accommodations with respect to the contraceptive coverage requirement for health coverage established or maintained or arranged by eligible organizations." (AR at 6.) An "eligible organization" is an organization that: "(1) Opposes providing coverage for some or all of the contraceptive services required to be covered . . . on account of religious objections; (2) is organized and operates as a nonprofit entity; (3) holds itself out as a religious organization; and (4) self-certifies that it satisfies the first

5

three criteria." (*Id.*) To self-certify, an organization must provide its health insurance provider or third party administrator (TPA) with a completed standardized form, verifying that it meets the definition of an "eligible organization." (*Id.*) The form must only be executed one time, prior to the beginning of the first plan year to which an accommodation will apply. (*Id.*) The regulations do not require that the self-certification form be provided to the government. (*Id.*) Further, an issuer or TPA is prohibited from requiring other documentation regarding the status of the eligible employer. (*Id.*)

According to the regulations, an "eligible organization" is "not required to contract, arrange, pay, or refer for contraceptive coverage; however, plan participants and beneficiaries . . . will still benefit from separate payments for contraceptive services without cost sharing." (*Id.*) The "Payments for contraceptive service" provision states:

> (I) A group health insurance issuer that receives a copy of the self-certification described in paragraph (b)(4) of this section with respect to a group health plan established or maintained by an eligible organization in connection with which the issuer would otherwise provide contraceptive coverage under § 147.130(a)(1)(iv) must–
>
> > (A) Expressly exclude contraceptive coverage from the group health insurance coverage provided in connection with the group health plan; and
> >
> > (B) Provide separate payments for any contraceptive services required to be covered under § 147.130(a)(1)(iv) for plan participants and beneficiaries for so long as they remain enrolled in the plan.
>
> (ii) With respect to payments for contraceptive services, the issuer may not impose any cost-sharing requirements (such as a copayment, coinsurance, or a deductible), or impose any premium, fee, or other charge, or any portion thereof, directly or indirectly, on the eligible organization, the group health plan, or plan participants or beneficiaries. The issuer must segregate premium revenue collected from the eligible organization from the monies

6

used to provide payments for contraceptive services. The issuer must provide payments for contraceptive services in a manner that is consistent with the requirements under sections 2706, 2709, 2711, 2713, 2719, and 2719A of the PHS Act. If the group health plan of the eligible organization provides coverage for some but not all of any contraceptive services required to be covered under §147.130(a)(1)(iv), the issuer is required to provide payments only for those contraceptive services for which the group health plan does not provide coverage. However, the issuer may provide payments for all contraceptive services, at the issuer's option.[2]

(AR at 35.)

The amended final regulations also require the insurance plan issuer to provide plan participants and beneficiaries "written notice of the availability of separate payments for contraceptive services contemporaneous with (to the extent possible), but separate from, any application materials distributed in connection with enrollment (or re-enrollment) in group health coverage." The regulations provide model language:

Your [employer/institution of higher education] has certified that your [group health plan/student health insurance coverage] qualifies for an accommodation with respect to the federal requirement to cover all Food and Drug Administration-approved contraceptive services for women, as prescribed by a health care provider, without cost sharing. This means that your [employer/institution of higher education] will not contract, arrange, pay, or refer for contraceptive coverage. Instead, [name of health insurance issuer] will provide separate payments for contraceptive services that you use, without cost sharing and at no other cost, for so long as you are enrolled in your [group health plan/student health insurance coverage]. Your [employer/institution of higher education] will not administer or fund these payments. If you have any questions about this notice, contact [contact information for health insurance issuer].

---

[2] According to the federal register, "[a]n issuer (or its affiliate) would be able to offset the costs incurred by the [TPA] and the issuer in the course of arranging and providing such coverage by claiming an adjustment in the Federally-facilitated Exchange (FFE) user fee." (AR at 3.) This appears to allocate the full actual cost of "free" services to the government.

(AR at 29.)

In sum, under the ACA, most businesses must provide health insurance coverage that includes FDA-approved contraceptive methods.  However, these insurance requirements are not applicable to employers with fewer than fifty full-time employees, companies with health insurance plans in existence on March 23, 2012, and unchanged after that date, and "religious employers."  Finally, "eligible organizations"—essentially non-profits that oppose providing contraceptive services coverage on account of religious objections—qualify for an accommodation.

### B.  Legatus

Legatus is a non-profit organization "established for the purpose of promoting the study, practice, and spread of the Catholic faith in the business, professional and personal lives of its members."  (Pg ID 926.)  Legatus is comprised of more than 4,000 members, including individuals and professional organizations.  (*Id.*)  It is contrary to Catholic doctrine to use, pay for, or support the use of contraception.  (Pg ID 927.)  In accordance with its religious beliefs, Legatus designed a health insurance policy for its employees to specifically exclude contraception.  (*Id.*)

Together with Weingartz Supply Company and Daniel Weingartz, Legatus filed suit on May 7, 2012.  At that time, and in October 2012, when the court granted a preliminary injunction as to Weingartz Supply Company and Weingartz, the safe harbor protected Legatus.  Consequently, as Legatus lacked standing, the court refused to "enjoin the Government from enforcing a rule that [was] not yet finalized."  (Pg ID 549.)  However, the court also noted that "in the event that the Government acts in a way

inimical to the rights Legatus seeks to protect—acts which the court presently views as doubtful—Legatus is not constrained from approaching the court with its concerns at that time." (Pg ID 550.)

The safe harbor currently protecting Legatus expires on January 1, 2014. The parties agree that, under the regulations, Legatus does not qualify for the "religious employer" exemption and that Legatus made changes to its policy after March 23, 2010, and is therefore not a grandfathered plan. (Pg ID 929.) The parties also agree that Legatus meets the criteria for an "eligible organization" under the amended final regulations and thus has the option to self-certify as such. Nonetheless, Legatus argues that the "'[eligible organization] accommodation' for religious, non-profit organizations is inadequate because it still requires that such organizations facilitate coverage for contraceptives, abortion, and abortifacients[3] contrary to their sincerely held religious beliefs." (Pg ID 931.) Put differently, Legatus argues that "a religious organization's decision to offer health insurance and its self-certification continue to serve as the sole triggers for creating access to free contraceptive and abortifacient services under the mandate's accommodation." (*Id.*) Further, Legatus argues that, although it could drop insurance coverage altogether as it has less than fifty full-time employees, this would both "violate its religious duty to provide for the health and well-

---

[3] The Government takes issue with Legatus's use of the terms "abortion" and "abortifacients," noting that "the regulations do not violate federal restrictions relating to abortion because FDA-approved contraceptive methods, including Plan B, Ella, and IUDs, are not abortifacients within the meaning of federal law." (AR at 20.) Moreover, "[e]mergency contraceptive pills are not effective if the woman is pregnant." (*Id.* (internal quotation marks omitted).)

being of its employees and their families" and force Legatus "to be non-competitive as employers [sic] in a market where other, non-Catholic employers will be able to provide insurance to their employees under the [ACA] without violating their religious beliefs." (Pg ID 932–33.)  Legatus seeks a preliminary injunction under the RFRA, 42 U.S.C. § 2000bb, to prohibit the Government from enforcing the HRSA Mandate against it.

## II.  STANDARD

Legatus brings its preliminary injunction motion under the RFRA and not the Free Exercise Clause of the First Amendment.[4]  However, because the RFRA and the Free Exercise Clause both seek to protect the same liberty interest—the free practice of one's religion—the court will take into account the jurisprudence of preliminary injunctions concerning First Amendment rights in deciding the present motion.

A preliminary injunction "is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  Courts should consider:  "(1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction."  *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009).  "These factors are not prerequisites but are factors that are to be balanced against each other."  *Overstreet*, 305 F.3d at 573.  However,

---

[4] The Free Exercise Clause states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.

"when a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Jones*, 569 F.3d at 265. Therefore, "because the questions of harm to the parties and the public interest cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is . . . whether the [regulation] at issue is likely to be found constitutional." *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

### III.  DISCUSSION

A flurry of cases filed in the aftermath of the ACA's passage challenged the HRSA Mandate. In many of these cases, the plaintiffs have been for-profit, secular companies (sometimes, but not always, corporations), that employ more than fifty full-time employees, and that are owned by religiously motivated individuals or families, like the first Plaintiff in this case. Each case framed the issue similarly: to comply with the HRSA Mandate, the secular for-profit organization was forced to either provide contraceptive coverage in violation of their religious beliefs or pay a crippling penalty. *See, e.g.*, *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1210 (D.C. Cir. 2013) ("[T]he Gilardis were faced with two choices:  adjust their companies' plans to provide the mandated contraceptive services in contravention of religious beliefs, or pay a penalty amounting to over $14 million per year."); *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 392 (3d Cir. 2013)*, cert. granted*, 2013 WL 5297800 (Nov. 26, 2013) ("Conestoga and the Hahns now argue that the Mandate is forcing them, day by day, to either disobey their religious convictions or

11

to incur ruinous fines."). Like Legatus, if these employers choose to provide health insurance that excludes contraception, they would be subjected to a $100 penalty for each employee per day. However, because Legatus has fewer than fifty full-time employees, if it dropped coverage altogether it would not face any penalty. In contrast, the fines in these cases were so severe because if an employer with at least fifty-one full-time employees does not offer health insurance to its employees, then beginning in 2014 the employer is assessed an annual penalty of $2,000 multiplied by the number of full-time employees minus thirty. Linda Chaikind & Chris L. Peterson, *Summary of Potential Employer Penalties Under the Patient Protection and Affordable Care Act (PPACA)*, Congressional Research Service (2010), *available at* http:// www.shrm.org/ hrdisciplines/ benefits/ Documents/ Employer Penalties.pdf (the rendering of this URL and subsequent URLs contains spaces).

The choice that Legatus faces is different; Legatus has three primary options.[5] First, to reiterate, as it employs less than fifty full-time employees, Legatus could drop health care coverage altogether. Second, it could self-certify as an "eligible organization." Third, it could maintain its current health care coverage and be assessed a penalty of $100 for each day per employee. Legatus contends that either of the first

---

[5] It appears that two other district courts have now ruled on whether the HRSA Mandate violated the RFRA as applied to religious non-profits that qualify for the accomodation. *See Zubik v. Sebelius*, Nos. 13cv1459, 13cv0303, 2013 WL 6118696, at *25 (W.D. Pa. Nov. 21, 2013); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 1:12-cv-02542 (E.D.N.Y. Dec. 16, 2013). In each of these cases, the Plaintiff employed more than fifty full-time employees. In both cases, the court granted an injunction and prohibited imposition of the HRSA Mandate.

two options would force it  to violate its religious beliefs and that the penalties it would face under the third are severe.

## A.  Standing

As an initial matter, the court must determine whether Legatus has standing to seek a preliminary injunction under the RFRA and request that this court enjoin enforcement of the HRSA Mandate.  In order to establish standing, three elements must be present:  (1) the plaintiff suffered an "injury in fact," (2) there is a causal connection between the injury and the conduct complained of, and (3) it must be "likely" that the injury will be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete or particularized and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (internal citations omitted).

In the introduction to its brief, Legatus acknowledges that "as an employer with less than 50 employees, [it] could drop [its] health insurance altogether without an annual penalty . . . however, not being able to provide health insurance benefits to [its] employees places Legatus at a substantial disadvantage."  (Pg ID 844–45.)  Legatus adds in the next sentence that it "has a religious duty to provide for the health and well-being of [its] employees in accordance with [its] Catholic Faith."  (Pg ID 845.)  However, throughout its brief, when discussing the option of dropping coverage, Legatus focuses on the largely hypothetical competitive disadvantage it would face as an employer without explaining its alleged religious obligation to provide health care.  Taken alone, as an undeveloped assertion, this injury may be too speculative to confer standing.

13

However, the court cannot ignore Legatus's statement that it perceives a religious obligation to provide for the health and well-being of its employees.  "[E]xercise of religion" means "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); *see also Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981) (concluding that it is not within the judicial function and competence to question whether a party is correctly understanding his religious doctrine because "[c]ourts are not arbiters of scriptural interpretation").  As such, Legatus has standing to move for a preliminary injunction under the RFRA.

## B.  Likelihood of Success on the Merits

The RFRA states:  "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.

### 1.  Substantial Burden

Catholicism teaches that "life begins at conception and that abortion, sterilization, and contraception are contrary to divine law."  (Pg ID 927.)  Legatus argues that the HRSA Mandate imposes a substantial burden on its religious exercise "by forcing Legatus to do precisely what [its] religion forbids:  impermissibly facilitate access to abortion-inducing products, contraception, sterilization, and related counseling."  (Pg ID 852.)

The Supreme Court has held that "putting substantial pressure on an adherent to modify his behavior and to violate his beliefs" substantially burdens a person's exercise

14

of religion. *Thomas*, 450 U.S. at 718. As noted earlier, "[i]t is not within the judicial function and judicial competence to inquire" whether a party is correctly understanding his religious doctrine as "[c]ourts are not arbiters of scriptural interpretation." *Id.* at 716. Accordingly, courts often simply assume that a law substantially burdens a person's exercise of religion when that person so claims. *See, e.g.*, *United States v. Lee*, 455 U.S. 252, 257 (1982) ("We therefore accept appellee's contention that both payment and receipt of social security benefits is forbidden by the Amish faith."); *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997) ("[W]e will assume that undoing May's dreadlocks imposes a substantial burden on his exercise of Rastafarianism."); *Hamilton v. Schriro*, 74 F.3d 1545, 1552 (8th Cir. 1996) ("[W]e assume that the regulations and policies at issue in the present case substantially burden Hamilton's exercise of his religion."). In the ACA context, the Tenth and Seventh Circuits have reached the same conclusion. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1137 (10th Cir. 2013) (en banc), *cert. granted*, 2013 WL 5297798 (Nov. 26, 2013) ("Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief."); *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013) ("[T]he substantial-burden inquiry evaluates the coercive effect of the governmental pressure on the adherent's religious practice and steers well clear of deciding religious questions."). *But see, e.g.*, *Conestoga Wood Specialities Corp. v. Sebelius*, 917 F. Supp. 2d 394, 413 (E.D. Pa. 2013) ("[W]e reject the notion that a plaintiff shows a burden to be substantial simply by claiming that it is.").

15

The Government argues that the regulations do not impose a substantial burden on Legatus because, as an "eligible organization," Legatus is "not required to contract, arrange, pay, or refer for contraceptive coverage; however, plan participants and beneficiaries . . . will still benefit from separate payments for contraceptive services without cost sharing."  (AR at 2.)  Under the accommodation, as the Government characterizes it, Legatus is required to simply fill out a form to self-certify verifying that it is as an "eligible organization."  The Government argues that Plaintiff would have had to fill out similar paperwork in the absence of the regulations.  It is true that, "[e]ven prior to the proposed regulations, because contraceptive benefits are typically in standard product designs, many eligible organizations directed their issuers and [TPAs] not to make payments for claims for medical services to which they object on religious ground."  (AR at 19.)  The Plaintiffs in *Zubik*, 2013 WL 6118696, at *25, used an analogy to explain why this argument misses the mark.  If a neighbor asks to borrow a knife to cut something on the barbecue grill, the request is easily granted.  But the next day when the same neighbor requests a knife to commit a crime, the request must be refused.  "It is the reason the neighbor requests the knife which makes it impossible for the lender to provide it on the second day."  *Id.*  Previously, when an employer like Legatus completed paperwork indicating that it would not be providing contraceptive services to its employees, the reason the documentation was used was irrelevant to Legatus.  "Now, under the 'accommodation,' the reason the documentation is required is so that contraceptive products, services, and counseling can be provided in direct contravention of [Legatus's] sincerely-held religious beliefs.  The Government is asking

16

[Legatus] for documentation for what [Legatus] sincerely believe[s] is an immoral purpose, and thus, they cannot provide it."  *Id*; *see also Roman Catholic Archdiocese of N.Y.*, No. 1:12-cv-02542, at *26 ("[T]he self-certification would . . . transform a voluntary act that plaintiffs believe to be consistent with their religious beliefs into a compelled act that they believe forbidden.").

Accordingly, the court accepts the assertion, and finds that Legatus will likely show at trial that the HRSA Mandate, even with the religious accommodation, substantially burdens the observance of the tenets of Catholicism.

### 2. Compelling Government Interest

The Government may substantially burden a person's exercise of religion "only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest."  42 U.S.C. § 2000bb-1(b)(1).  The Supreme Court has described compelling interests as those "of the highest order," *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); "only those interests of the highest order and those not otherwise served," *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972); "an overriding governmental interest," *Lee*, 455 U.S. at 258; and "the gravest abuses, endangering paramount interests," *Thomas v. Collins*, 323 U.S. 516, 530 (1945) (discussing the freedoms of speech and assembly).  The theme that emerges is the identification of "overriding," "paramount" governmental interests of the very "highest order."  Interests of a lesser magnitude, and interests that are not paramount, including those that are otherwise served, cannot be considered "compelling."

17

The Government advances two interests it argues as compelling that the HRSA Mandate aims to further.  First, the Government has an interest in promoting public health generally.  Courts have occasionally assumed, sometimes without deciding, that the improvement of public health is, at least in some instances, a compelling interest. *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 310 (1978) ("It may be assumed that in some situations a State's interest in facilitating the health care of its citizens is sufficiently compelling to support the use of a suspect classification."); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 498 (10th Cir.1998); (citing *Bakke* to conclude that "public health is a compelling government interest"); *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011) ("The Government clearly has a compelling interest in safeguarding the public health by regulating the health care and insurance markets."); *Dickerson v. Stuart*, 877 F. Supp. 1556, 1559 (M.D. Fla. 1995) ("The State of Florida has a compelling interest in the health of expectant mothers and the safe delivery of newborn babies.").  *But see Gilardi*, 733 F.3d at 1221 ("[E]ven giving the government the benefit of the doubt, the health concerns underpinning the mandate can be variously described as legitimate, substantial, perhaps even important, but it does not rank as *compelling,* and that makes all the difference").

Here, the Government argues that one benefit of the preventive services coverage is that "individuals will experience improved health as a result of reduced transmission, prevention or delayed onset, and earlier treatment of disease."  (AR at 233.)  Specifically, as this benefit relates to FDA-approved methods of contraception, the Government explains that "[b]y expanding coverage and eliminating cost sharing for

18

recommended preventive services, [the regulations are] expected to increase access to and utilization of these services, which are not used at optimal levels today." (AR at 233.) FDA-approved contraceptive services are integral to these predicted health outcomes, the government argues, as unintended pregnancies may delay "entry into prenatal care," prolong "behaviors that present risks for the developing fetus," and cause "depression, anxiety, or other conditions." (AR at 401.) However, "research is limited" for some outcomes of unintended pregnancies. (*Id.*) In addition, the Government argues, contraceptive coverage mitigates against "the increased risk of adverse pregnancy outcomes for pregnancies that are too closely spaced" and "have medical benefits for women who are contraindicated for pregnancy." (AR at 401–02.)

The Government's second interest is a compelling interest in "gender equality." (Pg ID 990.) Specifically, the Government says this means "assuring that women have equal access to health care services." (Pg ID 992). The Government argues that providing cost-free access to pregnancy prevention services, devices, and care eliminates gender-based disparity in health care costs. The federal register states that "prior to the implementation of the preventive services coverage provision, women of childbearing age spent 68 percent more on out-of-pocket health care costs than men."[6] (AR at 19.) The Government argues that these costs result in women foregoing

---

[6] The record fails to support the statement that 68 percent greater out of pocket spending was due to the absence of "the preventive services coverage provision," only that it was observed to have occurred earlier in time to the Government's implementation of the provision. It would seem that a greater demand for medical services generally by women, compared to men, could account for such disparities.

preventive care, which places them at a disadvantage in the workforce compared to men.

The Government argues that availability of oral contraception may have played a role in increasing the presence of women in the workforce, bringing them into more direct economic competition with men, and eventually improving women's wages. Martha J. Bailey et al., *The Opt-In Revolution?  Contraception and the Gender Gap in Wages*, 4 Am. Econ. J.: Applied Econ. 225 (2012).  The Supreme Court has echoed this sentiment:  "[t]he ability of women to participate equally in the economic and social life of the Nation has been facilitated by their ability to control their reproductive lives." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 835 (1992)[7].  According to some researchers, the increase of female enrollment in graduate programs such as law, medical, and dental schools is causally related to the availability of oral contraception. Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions*, 110 J. of Pol. Econ. 730 (2002).

Assuming, *arguendo*, that the Government could prove that the HRSA Mandate promotes at least one, if not both, of these interests, and that they are compelling, the Government is also required to "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."  *Gonzales v. O Centro*

---

[7] However, as the District of Columbia Circuit pointed out in *Gilardi*, "[t]ime and again, the government's interest in [abortion] cases has been deemed legitimate and substantial . . . .[B]ut it has never been compelling."  *Gilardi*, 733 F.3d at 1221; *see also Casey*, 505 U.S. at 846; *Gonzales v. Carhart*, 550 U.S. 124, 145 (2007).

*Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006) (upholding a preliminary injunction that enjoined the government's enforcement of the Controlled Substances Act (CSA) to allow a Brazilian religious sect to ceremonially use hallucinogenic tea because the government did not meet its burden of demonstrating a compelling interest to enforce the Act *on the sect*).  The court must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants."  *Id.* at 431; *see also Yoder*, 406 U.S. at 236 ("[I]t was incumbent on the State to show with more particularity how its admittedly strong interest in compulsory education would be adversely affected by granting an exemption to the Amish.").  To meet its burden, the Government must "offer[ ] evidence that granting the requested religious accommodations would seriously compromise its ability to administer" the HRSA Mandate.  *O Centro*, 546 U.S. at 435.  It has not, and it cannot.

"[A] law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of the Lukumi,* 508 U.S. at 547.

It is not disputed that the HRSA Mandate exempts millions of Americans through grandfathering and the "religious employer" exemption and does not apply at all to employers with less than fifty full-time employees who choose not to provide their employees health care.  According to U.S. Census Bureau data from 2010, firms with fewer than fifty workers employ 31.5 million Americans, or approximately twenty-eight

percent of all American workers.[8]  *See Statistics of U.S. Businesses: U.S., NAICS Sectors, Small Employment Sizes*, U.S. Census Bureau, http:// www.census.gov/ econ/ susb/ (last visited December 18, 2013).  With tens of millions of people untouched, the Government has undermined its arguments that the HRSA Mandate promotes *any* compelling government interest.  *Conestoga Wood*, 724 F.3d at 414 (Jordan, J., dissenting) ("[The mandate] cannot legitimately be said to vindicate a compelling governmental interest because the government has already exempted from its reach grandfathered plans, employers with under 50 employees, and what it defines as 'religious employers' thus voluntarily allowing millions upon millions of people—by some estimates 190 million—to be covered by insurance plans that do not satisfy the supposedly vital interest of providing the public with free contraceptives."); *Hobby Lobby*, 723 F.3d at 1144 (concluding that the "exemption for the millions of individuals" from the HRSA Mandate undermines the governments alleged compelling interests); *Korte*, 735 F.3d at 686 (holding that the ACA's exemptions meant that the Government could not pass RFRA's compelling interest test); *Geneva Coll. v. Sebelius*, No. 2:12-cv-00207, 2013 WL 3071481, at *10 (W.D. Pa. June 18, 2013) ("In light of the myriad exemptions to the mandate's requirements already granted, the requirement is woefully underinclusive and therefore does not serve a compelling government interest." (internal quotation marks omitted)); *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1297–98 (D. Colo. 2012) ("The government has exempted over 190 million health plan participants

---

[8] It cannot easily be determined how many of these workers are full-time, because the Census defined employment as "full *and part-time employees*."  *See Statistics of U.S. Businesses: Definitions*, U.S. Census Bureau, http:// www.census.gov/ econ/ susb/ definitions.html (last visited December 18, 2013) (emphasis added).

and beneficiaries from the preventive care coverage mandate; this massive exemption completely undermines any compelling interest in applying the preventive care coverage mandate to Plaintiffs."); *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 128 (D.D.C. 2012) ("Indeed, the 191 million employees excluded from the contraceptive coverage mandate include those covered by grandfathered plans alone."); *Roman Catholic Archdiocese of N.Y.*, No. 1:12-cv-02542, at *31 ("Tens of millions of people are exempt from the Mandate . . . .[M]illions of women thus will not receive contraceptive coverage without cost-sharing through the Mandate.  Having granted so many exemptions already, the Government cannot show a compelling interest in denying one to these plaintiffs.").[9]

Further, Legatus argues that expanding the "religious employer" exemption to include Legatus would not result in an appreciable harm to the Government's compelling interests.  The Government responds that there is a "rational distinction between [the narrow "religious employer" exemption] and the expansion Legatus seeks."  (Pg ID 993.)  Specifically, "houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers . . . to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even

---

[9] Previously, with respect to grandfathering alone, this court stated that "gradually implementing the ACA's health care provisions, instead of enforcing the entire law against all plans at the same time, does not appear to be indicative of how important the Government considers the interests of regulating public health and furthering gender equality."  (Pg ID 557–58.)  Over a year later, with intervening events having made more clear the implication of exemptions, and with the insight of other jurists across the country, the court has reconsidered its view.

if such services were covered under the plan." (*Id.*)  But regardless, "[s]ince the government grants so many exceptions already, it can hardly argue against exempting these plaintiffs." *Korte*, 735 F.3d at 686.

"Context matters" when applying the compelling interest test.  *Grutter v. Bollinger*, 539 U.S. 306, 327 (2004).  The court has no doubt that every level of Government may claim an interest in promoting public health and gender equality at least as a general matter.  But in this context, given the multiple tens of millions of Americans that are simply exempt from the HRSA mandate, the court is dubious that the Government would be able to prove a *compelling* interest in promoting the specific interests asserted in this litigation.

### 3.  Least Restrictive Means

If the Government were to meet the compelling interest test, it would then be required to prove that it has chosen "the least restrictive means" of furthering that interest.  42 U.S.C. § 20000bb-1(b)(2).  What constitutes "the least restrictive means" and how it is determined is subject to debate.  The Supreme Court has held that statutes fail the least restrictive means test when they are "overbroad" or "underinclusive."  *See Lukumi*, 508 U.S. at 546.  As discussed in the previous section, the sheer number of individuals exempt from the HRSA Mandate tends to demonstrate underinclusiveness.

The Sixth Circuit describes the least restrictive means test as "the extent to which accommodation of the [plaintiff] would impede the state's objectives," and explains that "[w]hether the state has made this showing depends on a comparison of the cost to the

24

government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *S. Ridge Baptist Church v. Indus. Comm'n*, 911 F.2d 1203, 1206 (6th Cir. 1990).  Granting Legatus an exemption would impede only marginally the Government's interests. However, it is unclear whether the "cost" to the Government of being required to honor an exemption for Legatus is greater than the spiritual "cost" to Legatus were the HRSA Mandate to be fully enforced.  The cost to Legatus appears to be provably substantial. *Zubik*, 2013 WL 6118696, at *25 (referring to the "cost of the loss of [Plaintiffs'] rights to freely exercise their religion" as "incalculable").  The cost to the Government appears provably small, especially given the myriad of exemptions to the ACA already in place.

The Tenth Circuit has extensively discussed the inherent difficulty of the least restrictive means test:

> [T]he notion that the government must prove that it has used the "*least* restrictive means," or that "*no* alternative forms of regulation" would suffice to serve its interests, is an odd creature.  On its face, it requires the government to prove a negative—that no matter how long one were to sit and think about the question, one could never come up with an alternative regulation that adequately serves the compelling interest while imposing a lesser burden on religion.  This is a formidable task. . . .[I]n the abstract, such a thing can never be proven conclusively; the ingenuity of the human mind, especially if freed from the practical constraints of policymaking and politics, is infinite.
>
> Thus, a number of courts that have considered the least restrictive means question . . . have held that the government should not be required "to refute every conceivable option in order to satisfy the least restrictive means prong of RFRA."  *Hamilton v. Schriro,* 74 F.3d 1545, 1556 (8th Cir. 1996) (characterizing such a requirement as a "herculean burden"); *accord Fowler v. Crawford,* 534 F.3d 931, 940 (8th Cir. 2008) (considering the identical language of the Religious Land Use and Institutionalized Persons Act ("RLUIPA")); *Spratt v. R.I. Dep't of Corr.,* 482 F.3d 33, 41 n.11 (1st Cir. 2007) (RLUIPA claim); *May v. Baldwin,* 109 F.3d 557, 563 (9th Cir. 1997) (RFRA claim).  Not requiring the government to do the impossible—refute

25

> each and every conceivable alternative regulation scheme—ensures that scrutiny of federal laws under RFRA is not "strict in theory, but fatal in fact." Thus the government's burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record.

*United States v. Wilgus*, 638 F.3d 1274, 1288–89 (10th Cir. 2011) (internal citations omitted). The *Wilgus* test effectively exempts the Government from being required to prove what the statute requires, *i.e.*, that it has employed "the least restrictive means of furthering [its] compelling governmental interest," 42 U.S.C. § 2000bb-1, and casts the burden on a Plaintiff to offer "alternative schemes" which then are subject to being refuted, with evidence, by the Government. Neither the Supreme Court nor the Sixth Circuit has adopted *Wilgus* and this court does not independently adopt it. Legatus nonetheless proposes a list of alternatives to the religious accommodation available to "eligible organizations," and an examination generally consistent with a *Wilgus* paradigm may be helpful. Legatus offers that:

> the government could also (I) offer grants to entities that already provide contraceptive services at free or subsidized rates and/or work with these entities to expand delivery of these services; (ii) directly offer insurance coverage for contraceptive services; (iii) offer tax deductions or credits for the purchase of contraceptives, reimburse citizens who pay to use contraceptives, or (iv) provide incentives for pharmaceutical companies and/or drug stores to provide such products free of charge or at reduces rates.

(*Id.*)

The Government expends little energy to counter each of these proposals, and instead points to the administrative record. In relevant part the record begins:

26

some commenters asserted that the contraceptive coverage requirement is
not the least restrictive means of advancing these compelling interests, and
proposed various alternatives to these regulations. All of these proposals
were considered, and it was determined that they were not feasible and/or
would not advance the government's compelling interests *as effectively as*
the mechanisms established in these final regulations and the preventive
services coverage regulations more generally.

(AR at 20.) However, this court agrees with the *Zubik* court's conclusion that "[g]eater

efficacy does not equate to the least restrictive means." *Zubik*, 2013 WL 6118696, at

*32. Not only does it "not equate," but efficacy seems far more likely correlated with the

opposite: intrusiveness. *See Mincey v. Arizona*, 437 U.S. 385, 393 (1978) ("[T]he mere

fact that law enforcement may be made more efficient may never by itself justify

disregard of the Fourth Amendment.") (internal citations omitted).

The record goes on to collectively address alternatives suggested during the

comment period that are similar to Legatus's proposals (i), (ii), and (iv). The federal

register states, "[f]or example some commenters suggested that the government could

provide contraceptive services to all women free of charge (through Medicaid or another

program) [similar to Legatus's proposal (ii)][10], establish a government funded health

benefits program for contraceptive services [similar to Legatus's proposal (i)], or force

drug and device manufacturers to provide contraceptive drugs and devices to women

for free [similar to Legatus's proposal (iv)]." (AR at 20.) The record offers several

unsatisfactory reasons in attempt to explain why one of these proposals would not be

---

[10] In its earlier opinion, the court noted that "Plaintiffs' alternative prospect of
establishing a separate agency whose purpose would be to provide contraception to
women raises a host of administrative and logistical problems . . . and does not appear
practical." (Pg ID 564.) The court continues to agree with that conclusion but notes that
it is not fatal to Legatus's argument that other, less restrictive alternatives may exist.

27

less restrictive.  First, "[t]he Departments lack the statutory authority and funding to implement these proposals."  (AR at 20.)  Lacking the statutory authority is immaterial to the least restrictive means inquiry.  *See Roman Catholic Archdiocese of N.Y.*, No. 1:12-cv-02542, at *35 ("If defendants lack the required statutory authority, Congress may pass appropriate legislation.")   And, funding cannot truly be the issue given the breadth of the Affordable Care Act and the health care market it seeks to regulate.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2609 (2012) ("By any measure, [the health care] market is immense.  Collectively, Americans spent $2.5 trillion on health care in 2009, accounting for 17.6% of our Nation's economy.  Within the next decade, it is anticipated, spending on health care will nearly double.").  Next, the federal register states that, as Congress did not adopt a single-payer system financed through taxes, but instead utilized the existing employer-based system of health care, these alternatives would be incompatible with the ACA's fundamental statutory scheme.  (*Id.*)  But the Government has nearly unfettered free reign in legislating to achieve its goals.  "It may be that the government's political interests are better satisfied by [the accomodation] than by trying to persuade voters to support other means to fund free contraceptives, but political expediency is not synonymous with 'least restrictive means.'"  *Conestoga Wood*, 724 F.3d at 415; *see also Nat'l Fed'n of Indep. Bus.*, 132 S. Ct. 2566 at 2612 ("Congress could have taken over the health-insurance market by establishing a tax-and-spend federal program like Social Security . . . .[I]nstead of going this route, Congress enacted the ACA.").  Finally, the federal register states, "[i]mposing additional barriers to women receiving the intended coverage (and its attendant benefits), by requiring them to take steps to learn about, and to sign up for, a new health

28

benefit, would make that coverage accessible to fewer women." (*Id.*) Yet the Government does not identify a single "step" or additional "barrier" that these proposals would introduce.

The record also addresses Legatus's proposal (iii), that the Government could "offer tax deductions or credits for the purchase of contraceptives, [or] reimburse citizens who pay to use contraceptives." The federal register states, [f]or another example, some commenters suggested that the government should establish tax incentives for women to use contraceptive services." (AR at 20.) The federal register explains, "[r]eliance only on tax incentives would . . . depart from the existing employer-based system of health coverage, would require women to pay out of pocket for their care in the first instance, and would not benefit women who do not have sufficient income to be required to file a tax return." (*Id.*) But this explanation, like those above, is unconvincing. In particular, with respect to women who do not file tax returns because they do not earn enough money, Defendant Kathleen Sebelius herself has stated that contraceptive services are readily available "at sites such as community health centers, public clinics, and hospitals with income-based support." (Pg ID 856.) In fact, community health centers, public clinics, and hospitals with income-based support cater to low-income women. For example, community health centers typically implement a sliding scale fee program, in which a patient's fee is determined by her annual income, household size, and desired treatment. *See, e.g.*, *Sliding Scale Services*, Mt. Baker Planned Parenthood, http:// www.plannedparenthood.org/ mbpp/ files/ mt-baker/ Family_Planning_Sliding_Scale_Service.pdf (last visited Nov. 6, 2012).

29

Although the Government has cast doubt on some of its proposals, Legatus's proposals (i), (iii), and (iv) suggest that "there are many ways to increase access to free contraception without doing damage to the religious-liberty rights of [Legatus]." *Korte*, 735 F.3d at 686 (7th Cir. 2013); *see also Gilardi*, 733 F.3d at 1222 ("[T]here are viable alternatives . . . that would achieve the substantive goals of the mandate while being sufficiently accommodative of religious exercise."). If the Government "has open to it a less drastic way of satisfying its legitimate interests, it may not choose a [regulatory] scheme that broadly stifles the exercise of fundamental personal liberties." *Anderson v. Celebrezze*, 460 U.S. 780, 806 (1983) (internal quotation marks omitted).

Analyzing the least restrictive means under the Supreme Court, Sixth Circuit, and Tenth Circuit tests, it appears to the court possible, but unlikely, that the Government could meet its burden at trial.

### C. Irreparable Harm to Legatus

Violation of a First Amendment right in itself constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). When First Amendment freedoms are at risk, the irreparable harm factor "merges" with the likelihood of success, such that if the plaintiff shows he is likely to succeed on the merits, he has simultaneously proven he will suffer an irreparable harm. *See McNeilly v. Land*, 684 F.3d 611, 620–21 (6th Cir. 2012) ("Once a probability of success on the merits was shown, irreparable harm followed . . . .[B]ecause [the plaintiff] does not have a likelihood of success on the merits, . . . his argument that he is irreparably harmed by

the deprivation of his First Amendment rights also fails."); *Reno*, 154 F.3d at 288 ("Thus,

to the extent that [the plaintiff] can establish a substantial likelihood of success on the

merits of its First Amendment claim, it also has established the possibility of irreparable

harm as a result of the deprivation of the claimed free speech rights.").

The possibility that the Government will be able to convince the court of either

the compelling nature of the interests it seeks to advance, or that the means it has

chosen are the least restrictive, is negatively correlated with Legatus's likelihood of

success on the merits.  As the court concluded in the preceding section, the

Government has made some showing, but not strongly so, of advancing a "compelling"

interest by the "least restrictive means."  The potential for harm to Legatus exists, and

with the showing Legatus has made thus far of being able to convincingly prove its case

at trial, it is properly characterized as irreparable.

### D.  Impact on Public Interest

"The public as a whole has a significant interest in ensuring equal protection of

the laws and protection of First Amendment liberties."  *Jones*, 569 F.3d at 278.  Similar

to the irreparable harm analysis, therefore, "the determination of where the public

interest lies also is dependent on a determination of the likelihood of success on the

merits of the First Amendment challenge because it is always in the public interest to

prevent the violation of a party's constitutional rights."  *Connection Distributing Co.*, 154

F.3d at 288; s*ee also McNeilly*, 684 F.3d at 621 ("Given the failure to show a substantial

likelihood of success on the merits of [the plaintiff's] claim that the contribution limits are

unconstitutional, the district court's conclusion that 'the [adverse] effect on the public

31

and the public interest' from enjoining the enforcement of the statute . . . 'would be very significant' is also proper.").

A preliminary injunction would serve the public interest to the extent that each party has made some showing of a likelihood of success on the merits, as described in section B above.

### E.  Balancing of Harm

Finally, the court must balance the harm to Legatus if the injunction were denied with the harm to the Government if the injunction is granted.  The purpose of the balance of harms test is:

> to underscore the flexibility which traditionally has characterized the law of equity. It permits the district court, in its discretion, to grant a preliminary injunction *even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim*, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.

*Jones*, 569 F.3d at 277 (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.,* 679 F.2d 100, 104 (6th Cir. 1982)) (emphasis added).

The fact that a ruling on the merits of this case will unquestionably occur after January 1, 2014 is significant.  Denying Legatus a preliminary injunction at this time will effectively grant the Government a default success on the merits—at least until Legatus can change its self-certification status and thereby exclude contraception to its employees if Legatus were to succeed at trial.  As already discussed, Legatus has shown some likelihood of success on the merits of those elements it must prove.  The

Government is in a weaker position with respect to proof of compelling interest and least restrictive means, about both of which there remain serious unanswered questions. However, the court reiterates that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. The Government will suffer some, but comparatively minimal harm if the injunction is granted. *Reno*, 154 F.3d at 288 (noting that "the government presumably would be substantially harmed if enforcement of a *constitutional* law . . . were enjoined"). And ultimately, "[t]he more the balance of harms tips in favor of an injunction, the lighter the burden on the party seeking the injunction to demonstrate that it will ultimately prevail." *Korte v. Sebelius*, 528 F. App'x 583, 586 (7th Cir. 2012); *see also Doe v. Sundquist*, 106 F.3d 702, 707 (6th Cir.1997) ("We are mindful that even when a plaintiff's probability of success on the merits of a claim is not very high, a preliminary injunction may be appropriate if the plaintiff is in serious danger of irreparable harm absent an injunction. Thus we have observed that the degree of likelihood of success that need be shown to support a preliminary injunction varies inversely with the degree of injury the plaintiff might suffer.").

The harm in delaying the implementation of a regulation that may later be deemed constitutional must yield to the risk presented here of substantially infringing the sincere exercise of religious beliefs. The court noted in its October 31, 2011, order denying Legatus injunctive relief, that it was "doubtful" at the time that the Government would eventually "act . . . in a way inimical to the rights Legatus seeks to protect." (Pg ID

33

550.)  The court appears to have been unduly hopeful. The balance of harms tips

strongly in favor of Legatus.  A preliminary injunction is warranted.

## IV.  CONCLUSION

IT IS ORDERED that Legatus's Motion for Preliminary Injunction [Dkt. # 68] is

GRANTED.  An order of injunction will issue separately.

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  December 20, 2013

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, December 20, 2013, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522